309 S.E.2d 58

**UMWA, etc., by Cecil ROBERTS and Michael Burdiss, and WVLF, AFL–CIO, by Joseph W. Powell**

v.

**Gretchen O. LEWIS, Commr., etc.**

**No. 15818.**

Supreme Court of Appeals of West Virginia.

Nov. 14, 1983.

Daniel F. Hedges, McIntyre, Haviland & Jordan and Terry M. Jordan and James M. Haviland, Charleston, for petitioners.

William Mitchell, Sp. Atty. Gen., Frank W. Helvey, Jr., Legal Div., Workers' Comp. Commr., Charleston, for respondent.

Jackson, Kelly, Holt & O'Farrell, John L. McClaugherty and Robert J. Busse, Charleston, amicus curiae for Contractors Ass'n of W.Va., W.Va. Chamber of Commerce, W.Va. Coal Ass'n, W.Va. Manufacturers Ass'n, and W.Va. Surface Mining and Reclamation Ass'n.

NEELY, Justice:

The United Mine Workers of America and the West Virginia Labor Federation have availed themselves of this court's willingness to "enlarge the scope of mandamus, especially where there is an urgent question of public policy or where there is an urgent question of public policy or where there is no reason for delay in adjudication of the issue by the highest State Court." *Walls v. Miller*, 162 W.Va. 563, 251 S.E.2d 491, 495 (1978). The petitioner unions seek a writ of mandamus to require the respondent Commissioner to perform her duties according to petitioners' interpretation of certain statutory requirements. Petitioners present five separate areas where they allege that the Commissioner's procedures are contrary to statutory mandates.[1]

I

THE ANNUAL REPORT

The petitioners allege, and the Commissioner admits, that the Commissioner has failed to file her department's report as required by *W.Va.Code* 23–1–17 [1974][2] on or about the fifteenth day of September annually. The Commissioner points out that the period from 30 June until 15 September is the busiest season for her with regard to the revision of benefit rates, the recomputation of benefits and awards, the development of revised premium rates, the updating of reserve losses and other actuarial accounts, and accounting revisions in the operation of the disabled workers' relief fund and the coal workers' pneumoconi-

---

1. We issued a rule to show cause, heard oral arguments, and on 24 May 1983 rendered an opinion and rulings. Both the petitioners and respondent took exception to certain of the rulings articulated in that opinion. We granted a rehearing on 5 July 1983 and reargument was heard before the court on 7 September 1983. After reargument it appeared to the court that certain of the court's original rulings were in error, and, therefore, the original opinion was withdrawn. This opinion restates the original relief afforded to the extent that it was not modified on rehearing and allows other relief not afforded in our original rulings.

2. *W.Va.Code*, 23–1–17 [1974] provides in its entirety:

Annually, on or about the fifteenth of September in each year, the commissioner and the occupational pneumoconiosis board shall make a report as of the thirtieth day of June addressed to the governor, which shall include a statement of the causes of the injuries for which the awards were made, an explanation of the diagnostic techniques used by the occupational pneumoconiosis board and all examining physicians to determine the presence of disease, the extent of impairment attributable thereto, a description of the scientific support for such techniques, and a summary of public and private research relating to problems and prevention of occupational diseases. The report shall include a detailed statement of all disbursements, and the condition of the fund, together with any specific recommendations for improvements in the workmen's compensation law and for more efficient and responsive administration thereof, which the commissioner may deem appropriate. Copies of all annual reports shall be filed with the secretary of state and shall be made available to the legislature and to the public at large.

osis fund. She admits, however, that the statute is clear and unambiguous in its requirement that a report be completed on or about 15 September of each year and represents that steps are currently being taken to comply with the statute. We find that the Commissioner is required by *Code* 23-1-17 [1974] to issue her report on or about 15 September, and consequently, on this issue we hold that petitioners are entitled to mandamus relief.

## II

## CONFLICT BETWEEN MAXIMUM DEGREE OF IMPROVEMENT AND ABILITY TO WORK

Petitioners assert that a claimant's treating physician often informs the Commissioner by medical report (WC–219) that the claimant has reached his maximum degree of improvement but is not yet authorized to return to work. This leads the Commissioner to terminate temporary total disability benefits. Thus, the claimant is unable to work but receives no compensation to offset his loss of income. In her answer, the Commissioner maintains that when such conflicting information is provided on form WC–219 her staff makes an independent evaluation of the entire case to determine whether the claimant should continue to receive temporary disability benefits.

We do not disapprove of the Commissioner's making an independent investigation to resolve the apparent conflict in the physician's answers on form WC–219. In fact, *W.Va.Code* 23-4-7a [1979] explicitly states that the Legislature believed it was necessary for the Commissioner to "operate a systematic program for the monitoring of injury claims where the disability continues longer than might ordinarily be expected." We do have reservations, however, about the Commissioner's approach to such cases. Petitioners allege, and the respondent does

not deny, that the commissioner often allows findings of maximum recovery and continued inability to return to work to be held compatible.

This court noted in *Mitchell v. State Workmens Compensation Commissioner,* 163 W.Va. 107, 256 S.E.2d 1 (1979) that there was no statutory definition of the term "temporary total disability." *Id.* 163 W.Va. at 110, 256 S.E.2d at 5. We went on to observe that historically the commissioner had notified parties that temporary total disability benefits would continue "until he [the worker] had been certified for employment or until further proper order of the Commissioner ...." *Id.* 163 W.Va. at 112, 256 S.E.2d at 6. In an explanatory note, the court took notice of the commissioner's occasional use of the phrase "until he has returned to work or has been certified by his attending physician for employment." *Id.* at n. 1. Thus, the commissioner's own language suggests that the relevant medical opinion focuses on ability to work rather than abstract notions about maximum recovery.

In fleshing out the meaning of "temporary total disability" the court also looked to precedent from other jurisdictions. We observed that the term "reaching maximum degree of improvement" and "being certified for employment" were often used interchangeably by other state courts. *Id.* See, e.g. *Douglass v. Gresen Manufacturing Co.,* 300 Minn. 82, 217 N.W.2d 846 (1974); *McAlear v. Arthur G. McKee and Co.,* 171 Mont. 462, 558 P.2d 1134 (1976); *Inserra v. Village Inn Pancake House,* 197 Neb. 168, 247 N.W.2d 625 (1976). Thus, in view of both the common practice in this state and legal precedent from other jurisdictions it appears unlikely to this court that circumstances would arise often in which a claimant could be found to have reached "maximum degree of improvement" without "being certified for employment." [3]

---

**3.** It is probably worthwhile to point out that we do not find the converse situation in which a worker is "certified for employment" without a finding that he has reached "maximum degree of improvement" to be logically inconsistent. It is not difficult to imagine circumstances in which a worker may have recovered sufficiently from a work-related injury to return to his employment without having yet reached his full level of recovery from the trauma. For example, a worker whose employment requires him to sit along an assembly line may sustain an injury to his foot which makes it impossible for him to get to work. He may regain sufficient mobility to return to employment before the time that his foot has fully healed.

■ There are cases in which these seemingly contradictory findings are reconcilable. The claimant may in fact have a permanent disability that prevents his return to his regular employment. (*See* Section III). Alternatively, he may be unable to return to work for reasons unrelated to a compensable injury. In the absence of a specific finding on these matters, however, it confounds simple reason to find that workers' compensation does not compensate a disabled worker. We hold, therefore, that when a physician indicates that a claimant has reached his maximum degree of improvement but cannot yet return to work, the Commissioner shall continue temporary total disability benefits until either the claimant is released to return to work or it conclusively appears that the claimant's inability to return to work is the result of a permanent disability or of medical problems that are unrelated to the compensable injury.

### III

### THE HIATUS BETWEEN THE CESSATION OF TEMPORARY TOTAL DISABILITY BENEFITS AND A PERMANENT PARTIAL DISABILITY AWARD

The petitioners contend that *W.Va.Code*, 23–4–7a [1979] demonstrates a clear intention that permanent partial disability benefits for an eligible claimant commence immediately upon the termination of temporary total disability benefits. In footnote 9 of *Mitchell v. Compensation Commissioner*, 163 W.Va. 107, 256 S.E.2d 1, 11 (1979) we said:

The goal of administrative economy and expeditious handling of claimants strongly suggests that the Commissioner might, in appropriate cases in which he terminates temporary total disability benefits, also make an award for any permanent disability benefits that may be due the claimant.... Claimants might be less inclined to protest termination of temporary total disability benefits if they received a contemporaneous permanent disability award. Certainly, the two issues are inextricably entwined from a medical standpoint, and if both

issues are treated by the Commissioner in the same order or by contemporaneous ones, the parties' protests can be heard together. We see nothing in the Workmen's Compensation statutes which precludes the Commissioner from adopting this administrative approach.

*W.Va.Code* 23–4–7a(c) [1979] says, in pertinent part, that:

"[I]f the examining physician or physicians conclude that the claimant has reached his maximum degree of improvement and has permanent partial disability, the temporary total disability benefits shall continue for thirty days or until an order is entered granting to the claimant a permanent partial disability award, whichever shall first occur: ...."

The petitioners argue that *W.Va.Code* 23–4–7a [1979] establishes a legal obligation on the part of the Commissioner to make permanent partial disability awards within thirty days of the termination of temporary total disability benefits. As we indicated in *Mitchell, supra,* we believe that the clear intention of the statute was to reduce to the greatest extent possible the hiatus between the cessation of temporary total disability benefits and the award of permanent partial disability.

We understand that the petitioners' fundamental complaint is that there are inefficiencies and bureaucratic delays throughout the workers' compensation system that impair the system's ability to make timely awards within 30 days.

The statute upon which petitioners rely as the foundation for their claim of a clear legal right to the performance of a non-discretionary, ministerial duty is *W.Va.Code* 23–4–7a [1979]. Subsection (a) of this statute establishes a "program for the monitoring of injury claims where the disability continues longer than might ordinarily be expected." It is not a general statutory provision designed to apply in all cases. Subsection (a) of *W.Va.Code* 23–4–7a [1979] does not require the Commissioner to refer a claimant for permanent partial disability evaluation immediately upon cessation of temporary total disability benefits. In fact, subsection (c), *supra*, of

*W.Va.Code* 23–4–7a [1979] runs directly contrary to the petitioners' position that such a referral is immediately required.

■ There does appear to us to be a clear intent in the total statutory scheme that in uncomplicated claims where there is no dispute about the percentage of permanent partial disability the award should be made within 30 days. In this mandamus action, however, petitioners have not presented us with any specific facts; rather, they have alleged patterns of behaviour that they conclude violate the statutes and ask us to direct the commissioner to change those patterns. The Commissioner denies such patterns, so we are at an impasse. In an appropriate case where it is demonstrated to the Court that there has been an unjustifiable hiatus between the termination of temporary total disability benefits and the granting of a permanent partial disability award, we would award a mandamus.

On the basis of *W.Va.Code* 23–4–7a [1979] we cannot conclude that all of the complex medical and legal inquiries attendant upon the granting of a permanent partial disability award *must* be compressed, in all cases, into a bare 30 days when the issues to be decided are not cut-and-dried. Consequently, we find the petitioners' arguments on this subject unpersuasive and we decline to award relief in mandamus.

## IV

## TERMINATION OF AN EMPLOYER'S RIGHT TO SELF–INSURE

The petitioners ask this Court to direct the Commissioner to establish a procedure by which a claimant can file an application or institute proceedings against a self-insurer to suspend or terminate an employer's self-insured status. *W.Va.Code,* 23–2–9 [1976] authorizes an employer to provide for the payment of benefits either by subscribing to the Workers' Compensation Fund or by electing to self-insure. The legislature vested in the Commissioner the authority and discretion to approve and supervise an employer's qualification as a self-insurer. In accordance with the legis-

lative directive, the Commissioner has promulgated regulations governing self-insurers.

It does not follow from the commissioner's discretionary role with regard to allowing an employer to become a self-insurer, however, that all of the Commissioner's subsequent dealings with self-insurers are also discretionary. In *United States Steel Corporation v. Stokes,* 138 W.Va. 506, 76 S.E.2d 474 (1953), a self-insurer sought a writ of prohibition to prevent the Commissioner from requiring that self-insurer to make payments for a claim which had been found compensable. This court held: "The State Compensation Commissioner is vested by statute, [citation omitted], with authority to *require* payment by an employer carrying his own risk, of awarded and accrued compensation benefits. In so doing, he performs an *administrative act.*" syl. pt. 3, *United States Steel Corporation v. Stokes, supra.* (emphasis added).

The significance of the term "administrative act" cannot easily be overstated. If the Commissioner were acting in an area in which she exercised discretion, it would be improper for this court or for individual claimants to second-guess her judgment. As the *Stokes* court recognized, however, that was not the case before it. In requiring payment by self-insurers of claims which were already approved, the Commissioner was "simply carrying out the clear mandate of the statute involving no ascertainment of facts or exercise of discretion." *Id.* 138 W.Va. at 513, 76 S.E.2d at 478.

Petitioners in the case before us allege that self-insurers abuse the system by refusing to comply with pay orders, refusing to pay medical bills, delaying the filing of accident reports, returning pay orders to the Commissioner because of typographical errors, and returning pay orders that are thought to be improper rather than filing protests. The fact of such abuses is not disputed, although the Commissioner questions the petitioners' assertions regarding the extent of such abuses. Frequency, however, is not a prerequisite for legal action. If petitioners can make out a claim that they have a legal right and are not

being afforded a legal remedy, this court must provide them with one.

We believe petitioners have made out such a case. If the Commissioner has a wholly administrative responsibility to *require* payment by self-insurers of approved claims, it follows that self-insurers have a reciprocal responsibility to comply with such requirements. The claimant has a legal right to all required payments without quibble and bureaucratic nit-picking, just as he would have if an employer subscribed to the fund and were not a self-insurer. The problem with the current system is that claimants have no available means by which to vindicate this right. They are the real parties in interest with regard to their disability claims, and it is reasonable to believe that they will be more vigilant in assuring that pay orders are met than the Commissioner who is already heavily burdened with administrative responsibilities.

One possible solution would be to allow claimants to bring direct action requiring the self-insurer to meet its obligations. In fact, however, this solution would likely prove unavailing. First, the claimant would be faced with the problem of forcing a private entity to submit to mandamus rulings that are designed to control public bodies. Secondly, and more significantly, such a system would create no incentive for self-insurers to comply with initial pay orders. Their continued abuse of the system would allow them to delay making required payments until the claimant brought action against them. A preferable solution, therefore, is to allow claimants to bring action against self-insurers which would require the Commissioner to terminate an employer's status as a self-insurer if he failed to make required payments or alternatively, to pay a heavy fine to the claimant whenever such an abuse occurred. This system will deter self-insurers from abusing the process.

The Commissioner has an administrative responsibility to require self-insurers to meet pay orders. Self-insurers have a reciprocal obligation to make required payments. Because claimants are most directly affected by the failure of those parties to meet their legal obligations, they are the most effective policemen of the system. Therefore, we order the Commissioner to establish a procedure by which claimants can bring action against self-insurers who fail to make required payments. A self-insurer who is found to have failed to make such required payments should either pay a sufficiently heavy fine to discourage such conduct in the future or forfeit his status as a self-insurer and become a member of the state-funded pool.

### V

### EMPLOYER REIMBURSEMENT OF CERTAIN CLAIMANT EXPENSES

Finally, the petitioners ask us to direct the Commissioner to order employers to pay any claimant's expenses for medical examinations or reports, and any witness costs, incurred as a result of unsuccessful protests by employers. The petitioners base their claim upon *W.Va.Code*, 23–5–1 [1973], the applicable part of which provides:

> After protest by the employer only to any finding or determination of the Commissioner made on or after July one, one thousand nine hundred seventy-one, and the employer does not prevail in its protest and, in the event the claimant is required to attend a hearing by subpoena or agreement of counsel or at the express direction of the commissioner, then such claimant in addition to reasonable traveling and other expenses shall be reimbursed for loss of wages incurred by him in attending such hearing.

The petitioners assert that the Commissioner operates the West Virginia Compensation Fund under the following informal policy: "After a Commissioner's award to a claimant, based upon the medical evidence of the Commissioner's medical reports, if there is an employer protest accompanied by medical evidence from the employer and only one medical report or no additional evidence from the claimant, the employer wins virtually automatically." (Affidavit in Support of Petition for Writ of Mandamus,

p. 4). The Commissioner has emphatically denied this allegation and the petitioners have not seen fit to submit any evidence of such a course of conduct to this court. Consequently, we do not accept the petitioners' assertion that, because of the policies of the Commissioner, a protest by an employer accompanied by the employer's medical evidence *necessarily* forces the claimant to secure new and cumulative medical testimony. We are not persuaded, therefore, that the statute requires employers to reimburse claimants for all expenses incurred in obtaining medical examinations and introducing medical testimony at protest hearings.

■ We do, however, find that the petitioners make a persuasive case that direct expenses incurred by the claimant in attending a protest hearing ought to be borne by the employer if the claimant prevails. In this regard, the petitioners' assertion that the cost of producing the claimant's doctor or doctors at a hearing *merely* for the purpose of *cross-examination* by the *employer* should be borne by the employer is well taken.

■ The adjudication of workers' compensation claims is not governed by the formal rules of evidence. Ordinarily the cross-examination of expert witnesses does little to illuminate the issues that are to be decided by the Commissioner, the Appeal Board, and, finally, this court. The legislature must have intended some meaning for the words, "and other expenses," found in the part of *Code* 23–5–1 [1973] quoted above, and we conclude that it was the legislative intent to reimburse the claimant for his out-of-pocket expenses directly related to his being required to attend a hearing as a result of an employer protest. If, therefore, the claimant is required to produce his own doctors so that they may be cross-examined by the employer, and the claimant ultimately prevails, the cost of producing those doctors should be borne by the employer.

■ The employer, of course, can avoid the payment of expert witness fees by permitting claimants' doctors' reports to be entered into evidence at the hearings without cross-examination. A routine requirement that all of the claimant's doctors be present at a protest hearing simply to have their testimony introduced into evidence places an enormous and unnecessary financial burden on a claimant and wastes the time of medical professionals. Such a burden is not contemplated by *W.Va.Code* 23–5–1 [1973]. If, however, the claimant wishes to produce his doctors for his own purposes, notwithstanding the employer's willingness to stipulate their written testimony into the record, then the claimant is still responsible for paying their fees.

■ We hold, therefore, that the petitioners are not entitled to mandamus relief insofar as they seek reimbursement for all expenses incurred in securing additional medical evidence to meet the employer's protest, but we do award mandamus relief that requires the Commissioner to provide, by appropriate rules and regulations, for the reimbursement of a claimant, should he prevail, for any witness fees incurred by the claimant exclusively for the purpose of making his witnesses available to his employer for cross-examination.

Accordingly, for the reasons set forth above, the writ of mandamus for which the petitioners pray is granted in part and refused in part and the writ of mandamus as moulded is awarded.

Writ denied in part and awarded in part.