EDITH H. JONES, Circuit Judge:
This appeal pits a debtor whose only significant asset is an office building in the troubled Austin, Texas real estate market against a lender who possesses a multimillion dollar lien on the property. After obtaining bankruptcy relief under Chapter 11, Greystone III proposed a “cramdown” plan of reorganization, hoping to force a write-down of over $3,000,000 on the secured lender’s note and to retain possession and full ownership of the property. Over the secured lender’s strenuous objections, the bankruptcy court confirmed the debt- or’s plan. In re Greystone III Joint Venture, 102 B.R. 560 (W.D.Tex.1989). On appeal, the district court upheld the bankruptcy court’s judgment. 127 B.R. 138.
For two reasons, we must reverse. First, the Greystone plan impermissibly classified like creditors in different ways and manipulated classifications to obtain a favorable vote. Second, tenant security deposit holders were not properly deemed an “impaired” class under the circumstances of this plan.
I.
Appellant Phoenix Mutual Life Insurance Corporation (“Phoenix”) lent $8,800,000, evidenced by a non-recourse promissory note secured by a first lien, to Greystone to purchase the venture’s office building. When Greystone defaulted on the loan, missing four payments, Phoenix posted the property for foreclosure. Greystone retaliated by filing a Chapter 11 bankruptcy reorganization petition.[1]
At the date of bankruptcy Greystone owed Phoenix approximately $9,325,000, trade creditors approximately $10,000, and taxing authorities approximately $145,000. The bankruptcy court valued Phoenix’s se *137 cured claim at $5,825,000, the appraised value of the office building, leaving Phoenix an unsecured deficiency of approximately $3,500,000 — the difference between the aggregate owed Phoenix and its secured claim.
As filed, Greystone’s Second Amended Plan of Reorganization (the “Plan”), the confirmation of which is challenged in this appeal, separately classified the Code-created unsecured deficiency claim of Phoenix Mutual, see 11 U.S.C. § 1111(b), and the unsecured claims of the trade creditors. The Plan proposed to pay Phoenix and the trade creditors slightly less than four cents on the dollar for their unsecured claims, but it also provided that Greystone’s general partner would satisfy the balance of the trade creditors’ claims after confirmation of the Plan.
In a separate class, the Plan further provided for security deposit “claims” held by existing tenants of the office building. These claimants were promised, notwithstanding the debtor’s eventual assumption of their leases, 11 U.S.C. § 365, 25% of their deposits upon approval of the Plan and 50% of their deposits at the expiration of their respective leases. The Plan stipulated that the general partner would “retain its legal obligations and ... pay the [tenant] ... creditors the balance of their claims upon confirmation.”
Finally, Greystone’s Plan contemplated a $500,000 capital infusion by the debtor’s partners, for which they would reacquire 100% of the equity interest in the reorganized Greystone.
Unsurprisingly, Phoenix rejected this Plan, while the trade creditors and the class of holders of tenant security deposits voted to accept it. On January 27, 1989, the bankruptcy court held a confirmation hearing at which the Debtor orally modified its Plan to delete the statements that the general partner would pay the balance of trade debt and tenant security deposit claims after confirmation. A Phoenix representative testified that the insurance company was willing to fund its own plan of reorganization by paying off all unsecured creditors in cash in full after confirmation. The bankruptcy court refused to consider this proposal and then confirmed Greystone’s modified Plan. The district court upheld the confirmation.
Phoenix Mutual now appeals on several grounds: (a) the plan classified Phoenix’s unsecured deficiency claim separately from that of other unsecured creditors for no valid reason; (b) the “new value exception” to the absolute priority rule did not survive passage of the Bankruptcy Code; and (c) unpaid tenant security deposits were not impaired claims that could vote on the plan.[2]
II.
Phoenix first attacks Greystone’s classification of its unsecured deficiency claim in a separate class from that of the other unsecured claims against the debtor. This issue benefits from some background explanation.
Chapter 11 requires classification of claims against a debtor for two reasons. Each class of creditors will be treated in the debtor’s plan of reorganization based upon the similarity of its members’ priority status and other legal rights against the debtor’s assets. 11 U.S.C. § 1122. Proper classification is essential to ensure that creditors with claims of similar priority against the debtor’s assets are treated similarly. Second, the classes must separately vote whether to approve a debtor’s plan of reorganization. 11 U.S.C. § 1129(a)(8), (10). A plan may not be confirmed unless either (1) it is approved by two-thirds in amount and more than one-half in number of each “impaired” class, 11 U.S.C. §§ 1126(c), 1129(a)(8); or (2) at least one *138 impaired class approves the plan, § 1129(a)(10), and the debtor fulfills the cramdown requirements of § 1129(b) to enable confirmation notwithstanding the plan’s rejection by one or more impaired classes. Classification of claims thus affects the integrity of the voting process, for, if claims could be arbitrarily placed in separate classes, it would almost always be possible for the debtor to manipulate “acceptance” by artful classification.
In this case, Greystone’s plan classified the Phoenix claim in separate secured and unsecured classes, a dual status afforded by 11 U.S.C. § 1111(b) despite the nonre-course nature of Phoenix’s debt. Because of Phoenix’s opposition to a reorganization, Greystone knew that its only hope for confirmation lay in the Bankruptcy Code’s cramdown provision. 11 U.S.C. § 1129(b). The substantive impact of cramdown will be discussed later. Procedurally, Grey-stone faced a dilemma in deciding how to obtain the approval of its cramdown plan by at least one class of “impaired” claims, as the Code requires.[3] 11 U.S.C. § 1129(a)(10). Greystone anticipated an adverse vote of Phoenix’s secured claim. If the Phoenix $3.5 million unsecured deficiency claim shared the same class as Grey-stone’s other unsecured trade claims, it would swamp their $10,000 value in voting against confirmation. The only other arguably impaired class consisted of tenant security deposit claims, which, the bankruptcy court found, were not impaired at all.
Greystone surmounted the hurdle by classifying Phoenix’s unsecured deficiency claim separately from the trade claims, although both classes were to be treated alike under the plan and would receive a cash payment equal to 3.42% of each creditor’s claim. Greystone then achieved the required favorable vote of the trade claims class.
Phoenix contends that Greystone misapplied § 1122 by classifying its unsecured claim separately from those of trade creditors. The lower courts rejected Phoenix’s argument in three steps. First, they held that § 1122 of the Code does not unambiguously prevent classification of like claims in separate classes. The only question is what types of class differentiations among like claims are acceptable. Second, Grey-stone’s unsecured deficiency claim is “legally different” from that of the trade claims because it arises statutorily, pursuant to § 1111(b). Third, “good business reasons” justify the separate classification of these unsecured claims. We must address each of these arguments.
Section 1122 prescribes classification of claims for a reorganization as follows:
(a) Except as provided in subsection (b) or this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such claims.
(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.
We observe from this language that the lower courts’ suggestion that § 1122 does not prevent classification of like claims in separate classes is oversimplified. It is true that § 1122(a) in terms only governs permissible inclusions of claims in a class rather requiring that all similar claims be grouped together. One cannot conclude categorically that § 1122(a) prohibits the formation of different classes from similar types of claims. But if § 1122(a) is wholly permissive regarding the creation of such classes, there would be no need for § 1122(b) specifically to authorize a class of smaller unsecured claims, a common feature of plans in reorganization cases past and present.[4] The broad interpretation of § 1122(a) adopted by the lower courts would render § 1122(b) superfluous, a *139 result that is anathema to elementary principles of statutory construction.
Section 1122 consequently must contemplate some limits on classification of claims of similar priority. A fair reading of both subsections suggests that ordinarily “substantially similar claims,” those which share common priority and rights against the debtor’s estate, should be placed in the same class. Section 1122(b) expressly creates one exception to this rule by permitting small unsecured claims to be classified separately from their larger counterparts if the court so approves for administrative convenience. The lower courts acknowledged the force of this narrow rather than totally permissive construction of § 1122 by going on to justify Greystone’s segregation of the Phoenix claim. Put otherwise, the lower courts essentially found that Phoenix’s unsecured deficiency claim is not “substantially similar” to those of the trade creditors.
Those courts did not, however, adhere to the one clear rule that emerges from otherwise muddled caselaw on § 1122 claims classification: thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan. As the Sixth Circuit observed:
[Tjhere must be some limit on a debtor’s power to classify creditors in such a man-ner_ Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.
In re U.S. Truck Co., 800 F.2d 581, 586 (6th Cir.1986). See also In re: Holywell Corp., 913 F.2d 873 (11th Cir.1990); Hanson v. First Bank of South Dakota, 828 F.2d 1310, 1313 (8th Cir.1987); In re Lumber Exch. Ltd. Partnership, 125 B.R. 1000, 1005-1006 (Bankr.Minn.1991); In re Waterways Barge Partnership, 104 B.R. 776, 783-86 (N.D.Miss.1989) (good discussion); In re Mastercraft Record Plating, Inc., 32 B.R. 106, 108 (Bankr.S.D.N.Y.1983), rev’d on other grounds, 39 B.R. 654 (S.D.N.Y.1984). We agree with this rule, and if Greystone’s proffered “reasons” for separately classifying the Phoenix deficiency claim simply mask the intent to gerrymander the voting process, that classification scheme should not have been approved.
Greystone’s reliance on Brite v. Sun Country Development, Inc., 764 F.2d 406 (5th Cir.1985), as an allegedly contrary rule is misplaced. That case allowed the debtor to impair a previously unimpaired class of creditors not for purposes of vote-getting but because the debtor belatedly discovered that it did not have sufficient funds to pay the creditors’ claims in full. The court found that the debtor’s decision to reclassify previously unimpaired creditors as impaired was necessary. Id. at 408. Sun Country does not support Greystone’s argument that plan proponents possess unlimited discretion to classify unsecured claims separately. We conclude that if § 1122(a) permits classification of “substantially similar” claims in different classes, such classification may only be undertaken for reasons independent of the debtor’s motivation to secure the vote of an impaired, assenting class of claims. To those proffered reasons we now turn.
Greystone contends that the “legal difference” between Phoenix’s deficiency claim and the trade creditors’ claims is sufficient to sustain its classification scheme. The alleged distinction between the legal attributes of the unsecured claims is that under state law Phoenix has no recourse against the debtor personally. However, state law is irrelevant where, as here, the Code has eliminated the legal distinction between non-recourse deficiency claims and other unsecured claims. See 11 U.S.C. § 1111(b)(1)(A); In re Tampa Bay *140 Associates, Ltd., 864 F.2d 47 (5th Cir.1989); Hanson, 828 F.2d at 1313.[5]
The purpose of § 1111(b) is to provide an undersecured creditor an election with respect to the treatment of its deficiency claim. Generally, the creditor may elect recourse status and obtain the right to vote in the unsecured class, or it may elect to forego recourse to gain an allowed secured claim for the entire amount of the debt. If separate classification of unsecured deficiency claims arising from non-recourse debt were permitted solely on the ground that the claim is non-recourse under state law, the right to vote in the unsecured class would be meaningless. Plan proponents could effectively disenfranchise the holders of such claims by placing them in a separate class and confirming the plan over their objection by cramdown. With its unsecured voting rights effectively eliminated, the electing creditor’s ability to negotiate a satisfactory settlement of either its secured or unsecured claims would be seriously undercut. It seems likely that the creditor would often have to “elect” to take an allowed secured claim under § 1111(b)(2) in the hope that the value of the collateral would increase after the case is closed.[6] Thus, the election under § 1111(b) would be essentially meaningless. We believe Congress did not intend this result.
As tíre bankruptcy court viewed this issue, the debtor’s ability to achieve a cramdown plan should be preferred over the creditor’s § 1111(b) election rights because of the Code’s policy of facilitating reorganization. The bankruptcy court resorted to policy considerations because it believed Congress did not foresee the potential impact of an electing creditor’s deficiency claim on the debtor’s aspiration to cramdown a plan. We disagree with this approach for three reasons. First, it results here in violating § 1122, by gerrymandering the plan vote, for the sake of allegedly effectuating a § 1129(b) cram-down. “Policy” considerations do not justify preferring one section of the Code, much less elevating its implicit “policies” over other sections, where the statutory language draws no such distinctions. Second, as shown, it virtually eliminates the § 1111(b) election for secured creditors in this type of case. Third, the bankruptcy court’s concern for the viability of cram-down plans is overstated. If Phoenix’s unsecured claim were lower and the trade debt were higher, or if there were other impaired classes that favored the plan, a cramdown plan would be more realistic. That Greystone’s cramdown plan may not succeed on the facts before us does not disprove the utility of the cramdown provision. The state law distinction between Code-created unsecured deficiency claims and other unsecured claims does not alone warrant separate classification.
Greystone next argues that separate classification was justified for “good *141 business reasons.” The bankruptcy court found that the debtor “need[s] trade to maintain good will for future operations.” In re Greystone III Joint Venture, supra at 570. The court further reasoned:
[I]f the expectation of trade creditors is frustrated ... [they] have little recourse but to refrain from doing business with the enterprise. The resulting negative reputation quickly spreads in the trade community, making it difficult to obtain services in the future on any but the most onerous terms.
Id. Greystone argues that the “realities of business” more than justify separate classification of the trade debt from Phoenix’s deficiency claim. This argument is specious, for it fails to distinguish between the classification of claims and the treatment of claims. Greystone’s justification for separate classification of the trade claims might be valid if the trade creditors were to receive different treatment from Phoenix. Indeed, Greystone initially created a separate class of unsecured creditors that could be wooed to vote for the plan by the promise to pay their remaining claims in full outside the plan. Greystone then changed course and eliminated its promise. Because there is no separate treatment of the trade creditors in this case, we reject Greystone’s “realities of business” argument.
Even if Greystone’s Plan had treated the trade creditors differently from Phoenix, the classification scheme here is still improper. At the confirmation hearing, none of the Debtor’s witnesses offered any reason for classifying the trade debt separately from Phoenix’s unsecured deficiency claim. There is no evidence in the record of a limited market in Austin for trade goods and services. Nor is there is any evidence that Greystone would be unable to obtain any of the trade services if the trade creditors did not receive preferential treatment under the Plan. Thus, the bankruptcy court’s finding that there were good business reasons for separate classification is without support in the record and must be set aside as clearly erroneous.[7]
Phoenix’s unsecured deficiency claim approximates $3,500,000, while the claims of the unsecured trade creditors who voted to accept the Plan total less than $10,000. Greystone’s classification scheme, which effectively disenfranchised Phoenix’s Code-created deficiency claim, is sanctioned neither by the Code nor by caselaw. The lower courts erred in approving it.
III.
As a fail-back position, Greystone argues that the office-building tenants constitute an impaired class whose votes for Grey-stone’s Plan should have been considered for purposes of satisfying the pre-condition of cramdown that there be one assenting, impaired class. The bankruptcy court held that the tenants were not an impaired class and could not vote on the Plan because Greystone had assumed their leases. The district court disagreed and held that despite the Debtor’s assumption of the leases, the tenants could be counted as an impaired accepting class. Phoenix argues this was error.
A debtor in Chapter 11 must either assume or reject its leases with third parties. 11 U.S.C. § 365. If the debtor does neither, the leases continue in effect and the lessees have no provable claim against the bankruptcy estate. See Matter of Whitcomb & Keller Mortgage Co., 715 F.2d 375, 378-79 (7th Cir.1983); In re Cochise College Park, Inc., 703 F.2d 1339, 1352 (9th Cir.1983). Under the Code, only creditors are entitled to vote on a plan of reorganization. See 11 U.S.C. § 1126(c). A party to a lease is considered a “creditor” who is allowed to vote, 11 U.S.C. § 1126(c), only when the party has a claim against the estate that arises from rejection of a lease. In re Perido Motel Group, Inc., 101 B.R. 289, 293-94 (Bankr. *142 N.D.Ala.1989). If, however, the debtor expressly assumes a lease, the lessee has no “claim” against the debtor under § 1126(a). See 11 U.S.C. §§ 865(g), 502(g). The rights created by assumption of the lease constitute a post-petition administrative claim under section 503(b)(1)(A) of the Code. LJC Corp. v. Boyle, 768 F.2d 1489, 1494 n. 6 (D.C.Cir.1985). The holder of such a claim is not entitled to vote on a plan of reorganization. 11 U.S.C. § 1126(a); In re Distrigas Corp., 66 B.R. 382, 385-86 (Bankr.D.Mass.1986).
Here, Greystone never rejected its leases with the tenants. There is thus no support for the assertion that the tenants' “claims” entitled them to vote on Grey-stone’s Plan. The district court erred in alternatively permitting confirmation of the Plan based on the tenants’ affirmative votes.
IV.
For the foregoing reasons, the judgment of the district court affirming the bankruptcy court’s confirmation of Greystone’s plan of reorganization is REVERSED. The case is REMANDED for proceedings consistent with this opinion.

. No issue concerning the "good faith” of Grey-stone’s Chapter 11 filing has been raised in the papers pertinent to this appeal. Compare In re Humble Place Joint Venture, 936 F.2d 814 (5th Cir.1991); In re Little Creek Dev. Co., 779 F.2d 1068 (5th Cir.1986).

. Because the case is resolved on these issues, we need not discuss appellant’s further contention that additional disclosure was required after the debtor orally modified its plan at the confirmation hearing.

. An impaired claim is defined at 11 U.S.C. § 1124. For present purposes, it suffices to say that Phoenix was impaired both as a secured and unsecured creditor.

. Greystone has never sought to justify its separate class of trade creditors under § 1122(b), nor did the lower courts employ that provision in their analysis. There is no suggestion in the *139 Code, however, that a class may be created under § 1122(b) in order to manipulate the outcome of the vote on a plan, rather than simply to enhance administration of the plan.

. Greystone argues that Hanson is not controlling because the issue there was whether it was clearly erroneous for the bankruptcy court to deny separate classification whereas the issue here is whether it was clearly erroneous for the court to approve the classification. The clearly erroneous rule has no application in this context. Whether a deficiency claim is legally similar to an unsecured trade claim turns not on fact findings but on their legal characteristics. This is an issue of law, freely reviewable on appeal. See Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1307 (5th Cir.1985). Subsidiary fact findings however, may be entitled to the deference of the clearly erroneous test. Id.

. In this case, for example, Greystone proposed to extinguish Phoenix’s $3,500,000 deficiency claim by the promised payment of $140,000. Under the valuation process, it confined Phoenix’s secured claim to $5.8 million. 11 U.S.C. § 506(a). Phoenix obviously objects to this arrangement because, in the future, it might ultimately receive more than the written-down value of the office building in a liquidation following foreclosure. Yet, with its voting rights effectively eliminated by separate classification, Phoenix has no leverage to persuade the Debtor to consider a more reasonable settlement. Had this scenario triumphed, Phoenix’s most realistic option might have been to take an allowed secured claim in the hope that eventually the market value of the office building will increase by more than $140,000 over the presently estimated value of the collateral.

. Two standards of appellate review apply to the debtor’s classification of claims. Issues such as the similarity in priority and legal attributes and the ultimate question whether treatment in the same or separate classes is necessary, are legal issues reviewable by our court de novo. See n. 5 supra. Whether there were any good business reasons to support the debtor’s separate classification of claims is a question of fact.