**In re CHATEAUGAY CORPORATION, Reomar, Inc. The LTV Corporation, et al., Debtors.**

**Bankruptcy Nos. 86 B 11270 through 86 B 11334, 86 B 11402 and 86 B 11464.**

United States Bankruptcy Court, S.D. New York.

May 28, 1993.

M.J. Crames, E.M. Emrich, and S.W. Milo, Kaye, Scholer, Fierman, Hays & Handler, and M.W. Munno, Seward & Kissel, New York City, for Chateaugay Corp., Reomar, Inc., and The LTV Corp., et al. (collectively, debtors).

M.A. Speiser, Stroock & Stroock & Lavan, New York City, for The Official Committee of Unsecured Creditors of LTV Steel Co., Inc.

W.E. Taylor, III, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for The Official Committee of Unsecured Creditors of the LTV Corp.

G.E. Brunstad, Jr., H.S. Horwich, L.M. Weil, and L.G. Ciabarra, Hebb & Gitlin, Hartford, CT, for The Aetna Cas. and Sur. Co. (Aetna).

## AMENDED MEMORANDUM OF DECISION ON SEPARATE CLASSIFICATION OF CLAIMS

FRANCIS G. CONRAD, Bankruptcy Judge (Sitting by Special Designation).

The issues presented[1] relate to Debtors' Second Amended Joint Plan of Reorganization (Plan). These issues are (1) whether workers' compensation claims asserted by Debtors' injured employees may be classified separately from and accorded different treatment than the workers' compensation claims asserted by the surety who acquired its claims by subrogation when it paid the underlying workers' compensation claims; and (2) whether it is required that Debtors establish a claims reserve for the full amount of the surety's claims.

We hold that the workers' compensation claims asserted by the workers themselves may be separately classified from those asserted by the surety who acquired those claims by subrogation.

We further hold that Debtors are not required to reserve in full for the surety's general unsecured claim.

### FACTS

Debtors filed petitions for reorganization under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* on July 17, 1986.

Adverse market conditions forced Debtors to scale down business. Debtors ceased business in some states.

Workers' compensation coverage must be provided by an employer in every state. This coverage is usually provided by one or more of the following methods: purchase of commercial insurance; payment into a state-sponsored fund; or by qualifying as a self-insurer.

States allow employers to become self-insurers if they demonstrate that they have the financial ability to make workers' compensation payments and can administer the claims. The employers must also provide security in case of default. The employer usually provides security by either posting a security bond or depositing cash in a trust fund. Backup security is provided through state-sponsored funds, which employers support through assessments.

LTV Steel found that in states where it had substantial operations, it was beneficial to self-insure rather than purchase commercial insurance.

Prior to the petition date, Aetna issued various surety bonds on behalf of Debtors to assure payment of Debtors' workers' compensation obligations.

On the Filing Date, LTV Steel ceased payment of self-insured claims in all states. The Bankruptcy Court issued an order on that same date, authorizing and empowering Debtors to pay certain pre-petition wages and salaries, reimbursement expenses, and employee benefits (the "July 17 Order").

The last paragraph of the July 17 Order states:

> ORDERED, that the Debtors be, and they hereby are authorized and empowered to pay all employees' workers' compensation, "black lung" and related benefits and claims which arose or accrued prior to the Filing Date.

Later, LTV Steel reinstated payment of workers' compensation benefits in Illinois, Indiana, and Ohio. These are the states that Debtors expect to be the core of the restructured company. LTV Steel calculated that maintenance of self-insured status in these states would result in a ten-year cash savings of $136 million when compared to the costs of commercial or state-sponsored insurance programs.

LTV Steel did not reinstate the self-insured payments in other states because it determined that abandoning these payments would have a beneficial effect on

---

1. Our subject matter jurisdiction over this controversy arises under 28 U.S.C. § 1334(b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core matter under 28 U.S.C. §§ 157(b)(2)(A) and (B). This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. 52 as made applicable by F.R.Bkrtcy.P. 7052.

LTV Steel, resulting in $108 million in savings over ten years.

LTV Steel noted that the impact of this default on individual workers' compensation claimants was minimized because most of these payment obligations were picked up by surety companies or state-sponsored funds. Upon Debtors' default, Aetna paid approximately $41,947,561.76 of workers' compensation claims under the bonds it issued and has asserted claims against Debtors through subrogation to the claims of the disabled and injured employees whose claims Aetna paid.

Debtors' Plan includes the resumption of payment in full of post-confirmation workers' compensation payments to employees or former employees, but not to any person whose claim is derived from an employee. Thus, the workers' compensation claims of sureties are excluded.

In an earlier proceeding, the State of Michigan, who was required to pay the workers' compensation claims of its residents when Debtors defaulted, moved for an order clarifying the last paragraph of the July 17 Order and interpreting it as a mandatory obligation that Debtors pay pre-petition benefits in all states. Judge Lifland instead ruled that the paragraph authorizing payment of workers' compensation claims that arose pre-petition was permissive and did not require LTV Steel to pay all pre-petition workers' compensation claims.

Judge Lifland concluded "that LTV Steel's state-by-state treatment of workers' compensation claims is based upon sound business judgment, constitutes a reasonable exercise of the discretion conferred upon it by the Order and is consistent with [LTV Steel's] fiduciary duty to preserve and maximize the value of its estate for the benefit of all creditors." Findings of Fact and Conclusions of Law and Order Denying Motion of State of Michigan, dated November 18, 1986 (November 18 Clarification) at 11. The State of Michigan appealed the November 18 Clarification and contended that the pre-petition payments of some pre-petition claims, but not all, constituted a distribution that violates the classification

rules of 11 U.S.C. § 1122. *In re Chateaugay Corp.*, 80 B.R. 279, 280 (S.D.N.Y.1987) (Lasker, J). Judge Lasker found the November 18 Clarification to be interlocutory and not appealable. The court also noted that § 1122 did not apply to the pre-plan stages of a bankruptcy proceeding because it would limit the flexibility of the court and debtor and be inconsistent with the purposes of the bankruptcy laws. *Id.* at 288.

Under Debtors' proposed Plan, the workers' compensation claims of individual workers are unimpaired and will be paid in full. Aetna's claims, derived from the workers' compensation claims, are impaired and will receive a pro rata distribution of securities. The value of this pro rata distribution will be a dividend of about 18 to 22% of the allowed claim.

Aetna asserts that because Plan confirmation is imminent, the Court must address Aetna's request that its claims for reimbursement, owed by Debtors to Aetna for workers' compensation benefits paid by Aetna during the course of the bankruptcy proceeding to LTV Steel workers relating to pre-petition injuries, be classified and treated in the same manner as the workers' compensation claims of individual workers.

Debtors argue that separate classification and different treatment of the workers' compensation claims and Aetna's surety claims under its Plan are appropriate because of legitimate and compelling business reasons. Debtors maintain that, unlike Aetna, the individual employees will play a significant role in Debtors' reorganization effort.

## DISCUSSION

■ Workers' compensation claims arising out of pre-petition injuries are ordinarily entitled to general unsecured status. *St. Paul Fire & Marine Ins. Co. v. Rea Express, Inc. (In re REA Express Inc.)*, 442 F.Supp. 71, 74 (S.D.N.Y.1977). Aetna, however, argues that if Debtors provide more favorable treatment to the individual workers' claims and elevate them to an unimpaired status, then there is no legal justification for treating the workers' compensa-

tion claims held by Aetna, through subrogation, differently.

Aetna urges that the initial decision to allow disparate treatment of workers' compensation claims in the pre-plan stages of the bankruptcy proceeding must now be reassessed in view of the fact that a plan of reorganization is imminent.

The individual workers have continued to receive workers' compensation benefits based on pre-petition injuries. The payments have been made from surety bonds or state workers' compensation funds or, in states where Debtors reinstated self-insurance workers' compensation plans, from the Debtors. Thus, individual workers in all the states are receiving the same treatment and inasmuch as, under the plan, LTV Steel will resume payments to individual workers, they will continue to receive the same treatment and receive payment in full.

Aetna notes that 11 U.S.C. § 1122[2] relates to placing substantially similar claims in the same class and 11 U.S.C. § 1123(a)(4)[3] provides that claims and interests in the same class must receive the same treatment. Relying on § 1122 and the equality of treatment requirement of § 1123(a)(4), Aetna maintains that its claim for reimbursement of workers' compensation benefits it paid to workers should receive the same treatment as claims of individual workers' compensation beneficiaries. Aetna asserts that when it paid the workers' compensation benefits to the workers, it became subrogated to their rights. Therefore, Aetna argues that it should be placed in the same class and receive the same treatment as the individual workers' compensation recipients.

The issue of whether similar claims may be separately classified has been addressed by various courts with differing results. Some courts find that all similar unsecured claims must be placed in the same class. See, e.g., *Granada Wines, Inc. v. New England Teamsters and Trucking Industry Pension Fund,* 748 F.2d 42, 46–47 (1st Cir.1984). Other courts take a "more flexible and pragmatic approach" and allow separate classification of similar claims. *In re AG Consultants Grain Division, Inc.,* 77 B.R. 665, 671 (Bkrtcy.N.D.Ind.1987); *Teamsters National Freight Industry Negotiating Committee v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.),* 800 F.2d 581, 587 (6th Cir.1986); *In re Drexel Burnham Lambert Group Inc.,* 138 B.R. 723, 757–758 (Bkrtcy.S.D.N.Y.1992).

Courts that allow the separate classification of similar claims maintain that while "the express language of [§ 1122(a)] explicitly forbids a plan from placing dissimilar claims in the same class, [§ 1122(a)] does not, though, address the presence of similar claims in different classes." *In the Matter of Jersey City Medical Center,* 817 F.2d 1055, 1060 (3rd Cir.1987).

In agreeing with the theory of grouping similar claims in different classes, the *Jersey* court noted that "Congress intended to afford bankruptcy judges broad discretion to decide the propriety of plans in light of the facts of each case." *Id.* at 1060–1061.

Some courts, calling for a narrow interpretation of § 1122(a), assert that while the section may not totally prohibit the separate classification of similar claims, there must be some constraint on a debtor's ability to separately classify claims. *Phoenix Mutual Life Insurance Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture),* 948 F.2d 134, 139 (5th Cir. 1991); *In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 830 (Bkrtcy.S.D.N.Y.

**2.** Section 1122 relating to Classification of claims or interests provides:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

**3.** Section 1123(a)(4) provides in relevant part:

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

(4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.

1982). According to these courts, this interpretation is supported by § 1122(b), which authorizes the formation of a class of smaller unsecured claims. These courts maintain that a broad interpretation of § 1122(a), allowing for the unfettered classification of claims, would render § 1122(b), which allows for a separate class of administrative convenience claims, superfluous. *Greystone III, supra,* 948 F.2d at 138–139. This, the courts reason, would be contrary to statutory construction principles. *Id.*

This explanation has led one commentator, who disagrees with a narrow interpretation on the ability of courts to classify claims, to suggest that the inclusion of § 1122(b) may have a different interpretation. According to this commentator, § 1122(b) may be "an exception to the one requirement actually stated in section 1122(a), that only substantially similar claims be placed together. That is, section 1122(b) could be read as authorizing a class of de minimis claims even if the claims are not substantially similar to each other." Rusch, *Gerrymandering the Classification Issue in Chapter Eleven Reorganizations,* 63 U.Colo.L.Rev. 163, 182 n. 95 (1992).

The *AG Consultants* court discerned the following intent from the statutory language of § 1122(a): "Some differences in the treatment of unsecured claims must have been contemplated by Congress, or the provision for classifying claims under 11 U.S.C. § 1122 would be superfluous and purposeless." *AG Consultants, supra,* 77 B.R. at 671.

The *AG Consultants* court held that:

a plan proponent under § 1122

1) may have the flexibility to place claims of a similar nature in different classes; and

2) may not place claims of a dissimilar nature in the same class.

*Id.* at 676.

*AG Consultants* recognized the subtle distinction between classification and discrimination often missed in classification cases.

Most courts that permit separate classification of claims have found that a plan proponent's discretion to classify claims and interests in accordance with the facts and circumstances of the particular case is nevertheless limited. *Travelers Insurance Co. v. Bryson Properties, XVIII (In re Bryson Properties XVIII),* 961 F.2d 496, 502 (4th Cir.1992). "[T]here must be some limit on the debtor's power to classify creditors.... The potential for abuse would be significant otherwise." *U.S. Truck, supra,* 800 F.2d at 586. "If the plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic priority rights, the plan cannot be confirmed." *Bryson, supra,* 961 F.2d at 502, citing, *In re Holywell Corp.,* 913 F.2d 873, 880 (11th Cir.1990).

The classification issue is often presented in the context of a plan proponent's attempt to separately classify a secured creditor's deficiency claim[4] from that of other general unsecured claims. When it is clear that the holder of a large deficiency claim will vote to reject the plan and its vote predominates the unsecured claims, the plan proponent separately classifies the dissenting deficiency creditor's claim from the claims of other unsecured creditors who will vote in favor of the plan. This ensures that an impaired class of creditors will vote in favor of the plan, thereby invoking § 1129(b)(1),[5] the cram down provision of the Code. This permits a debtor to

---

**4.** When a creditor has an allowed claim secured by a lien on collateral but the value of the collateral is less than the amount of the claim, the claim is bifurcated into a secured claim that equals the value of the collateral and an unsecured claim for the deficiency under § 506(a).

**5.** Section 1129(b)(1) provides in relevant part: Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8)

[requiring that all classes either accept the plan or not be impaired under the plan] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interest that is impaired under, and has not accepted, the plan.

obtain confirmation of a plan despite the dissent of a deficiency claimant. We make no holding today whether we would permit this type of classification in a so-called "single asset" case.

Courts have refused to permit debtors to separately classify similar claims in order to gerrymander the votes on a reorganization plan to gain acceptance of the plan. *Greystone III, supra,* 948 F.2d at 139. When "[t]he classification is clearly for the purpose of manipulating voting[,] . . . it may not stand." *Bryson, supra,* 961 F.2d at 502. "[A]lthough the debtor retains some flexibility in the classification of substantially similar claims," it may not separately classify claims only for the purpose of forming an impaired class. *In re 500 Fifth Ave. Associates,* 148 B.R. 1010, 1019 (Bkrtcy.S.D.N.Y.1993).

In *500 Fifth Ave.,* while the court refused to allow the separate classification of Code-created recourse claims,[6] finding that in the context of a chapter 11 case, the claims were not different than contract-based recourse claims or unsecured claims, the court nevertheless noted the flexibility afforded a debtor and acknowledged that separate classification would be allowed if the debtor offered a reason for the classification independent of the purpose of forming an impaired class. *Id.*

Inasmuch as courts have applied a "narrow rather than totally permissive construction of § 1122," *Greystone III, supra,* 948 F.2d at 139, plan proponents usually attempt to provide other justification for separately classifying similar claims.

One of the reasons for separate classification proffered by the *Greystone III* debtor, when it proposed to separately classify a secured creditor's deficiency claim from trade creditors' claims, was that there were "good business reasons" for the separate classification. *Greystone III, supra,* 948 F.2d at 140–141. The reasoning was that because of the "realities of business," the debtor was dependent on the maintenance

of goodwill with trade creditors to obtain trade's future services. *Id.* at 141.

The *Greystone III* court rejected the "realities of business" argument because, although the deficiency creditor and the trade creditors were classified separately, they received similar treatment. *Id.* In dicta, the court declared that "separate classification of the trade claims might be valid if the trade creditors were to receive different treatment from [the deficiency claimant]." *Id.* This is a remarkable recognition of the classification/discrimination dichotomy that is completely ignored in *Greystone III.*

Nevertheless, the *Greystone III* court found that, under the facts and record of that case, the trade creditors did not qualify for different classification or treatment than the deficiency claimant because there was no showing of a limited market in the area for trade goods and services. Nor was there a showing that the debtor would be unable to obtain trade services if the trade creditors were deprived of preferential treatment under the plan. *Id.* The court declared that the record did not support a finding that good business reasons existed for separate classification. *Id.*

By contrast, in the case **sub judice,** Debtors provide different treatment to the workers' compensation claims of the injured and disabled employees from the workers' compensation claims to which Aetna was subrogated. Debtors maintain that there are compelling business reasons to separately classify the claims and favor the workers' claims which do not apply to Aetna. Debtors urge that the favored treatment afforded workers is an acknowledgement of the vital role the employees play in Debtors' reorganization effort, while Aetna has no role in the reorganization. The cooperation of the workers is viewed as an absolute requisite for the viability of the restructured company.

Debtors offer evidence of the serious consequences that ensued when they tam-

---

6. Under certain conditions, § 1111(b)(1)(A) converts a creditor's § 506(a) deficiency claim into a recourse claim, whether or not the creditor had recourse outside of bankruptcy. We note

that *500 Fifth Avenue,* like many other opinions discussing the issue, fails to explore fully the economic and financial interstices of the claim from the lender's perspective.

pered with employee benefits in the past. In the early stages of the bankruptcy proceeding, Debtors ceased paying retiree medical benefits, resulting in union-led disruptions of Debtors' business and economic loss. Debtors urge that full payment of employee claims will elevate employee morale and preserve good labor-management relations. Any perceived labor-management discord would lead to Debtors' inability to secure favorable sales contracts. In addition, implementation of the recently negotiated collective-bargaining agreement depends upon workers' compensation beneficiaries receiving full payment on their claims. Debtors maintain that these business imperatives require that Debtors' Plan offer favorable treatment for the workers' compensation claims of individual workers. They maintain that the justification for favorable treatment, however, does not apply to Aetna's workers' compensation claims.

▆ In most reorganization cases, creditors of the same rank will be placed in the same class but under appropriate circumstances, separate classification may be warranted. *AG Consultants, supra*, 77 B.R. at 674. Classification of similar claims is permissible if the classification scheme of the claims or interests is reasonable. *Jersey, supra*, 817 F.2d at 1061.

▆ Section 1123(a)(4) requires that each claim or interest of a particular class receive the same treatment; however, it "only requires equality of treatment of claims or interests placed in the same class." *Id.*

Thus, it may be appropriate in some circumstances to separate the individual workers' compensation claims from that of other unsecured creditors and to treat them differently, if the interests of the other unsecured creditors are distinct from and "in a different posture" than the interests of the individual workers. *U.S. Truck, supra*, 800 F.2d at 587.

▆ Aetna correctly notes that the Code refers to the classification of claims rather than claimants. Courts, however, routinely look to the interests of the holders of the claims in determining whether to permit their claims to be separately classified. In permitting a separate classification for a union's claim based on the rejection of a collective bargaining agreement, the court in *U.S. Truck, supra*, 800 F.2d at 587, found that the union's interest differed from other creditors' interests and that the union had "a different stake in the viability of the reorganized company." *Id.* The court also found that the "union employees have a 'virtually unique interest'." *Id.* The court held that the difference in the interest of the holder of the claim put the "claim in a different posture" than other unsecured claims. *Id.* In *AG Consultants*, we had no objection to separately classifying agricultural producers' unsecured claims when it was demonstrated that they were the only group continuing to do business with the debtor. *AG Consultants, supra*, 77 B.R. at 670, 676.

"Classification is rooted not merely in statute, but is predicated on the basic need for a reasonable and fair method of maximizing reorganization prospects." *AG Consultants, supra*, 77 B.R. at 671. Debtors offer strong evidence that the claims of the individual workers should be paid in full.

Aetna argues that their claims are not only similar to the individual workers' compensation claims, they *are* the workers' compensation claims by virtue of Aetna's subrogation to the workers' claims under 11 U.S.C. § 509(a).[7] Aetna maintains that it is subrogated to the rights of those workers' compensation beneficiaries whose claims it paid.

The argument that Aetna's claims are identical to the individual workers' claims fails to consider the express terms of § 509. Section 509(a), which provides that an entity who pays a claim of a creditor is subrogated to the rights of that creditor,

---

7. 11 U.S.C. § 509(a) provides is relevant part:
  (a) Except as provided in subsection (b) or (c) of this section, an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment.

begins with the phrase "Except as provided in subsection (b) or (c) of this section." Section 509(c) [8] subordinates the subrogation claim of an entity that pays a creditor to the claim of that creditor "until such creditor's claim is paid in full." Section 509(c) provides a basis to distinguish the claims of the individual workers from the workers' compensation claims held by Aetna because Aetna's entitlement to receive payment on its claims is subject to a condition not applicable to the individual workers, i.e., Aetna's claims and rights are subordinate to the claims and rights of each employee until that employee is paid in full on its claim.

Thus, the Code itself recognizes a distinction between Aetna's claims and the claims of the individual workers. This provides the legal distinction between these claims and, in conjunction with the business justification which results from the symbiotic relationship between Debtors and the employees, the basis for separately classifying the claims.

This Code-recognized distinction and the business justification are sufficient to render all individual workers' compensation claims distinct from and in a different posture than the workers' compensation claims held by Aetna.

■ We agree with Aetna that a surety is subrogated to the rights of the creditor when it pays the claim for its principal on a bond. *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136, 83 S.Ct. 232, 235, 9 L.Ed.2d 190 (1962). The surety, through subrogation, may assert all of the creditor's rights. *Pearlman, supra*, 371 U.S. at 136–137, 83 S.Ct. at 235. Aetna correctly notes that the character of debts are fixed when incurred, and these rights remain with the claim when transferred. *Shropshire, Woodliff, & Co. v. Bush*, 204 U.S. 186, 189, 27 S.Ct. 178, 179, 51 L.Ed. 436 (1907). The rights to which a creditor becomes subrogated, on payment after the petition, are fixed at the petition. *United States v. Marxen*, 307 U.S. 200, 207–208, 59 S.Ct. 811, 815, 83 L.Ed. 1222 (1939).

■ As of the petition date, however, the workers' compensation beneficiaries' rights were those of general unsecured creditors. Aetna succeeded to the rights of the workers' compensation beneficiaries at the petition date, which rights were to be general unsecured claimants.

■ Finally, Aetna argues that under § 509(a) and § 1124,[9] Aetna was subrogat-

---

**8.** 11 U.S.C. § 509(c) provides:

The court shall subordinate to the claim of a creditor and for the benefit of such creditor an allowed claim, by way of subrogation under this section, or for reimbursement or contribution of an entity that is liable with the debtor on, or that has secured, such creditor's claim, until such creditor's claim is paid in full, either through payments under this title or otherwise.

**9.** Section 1124 provides:

Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—

(1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest;

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—

(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or

(3) provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to—

(A) with respect to a claim, the allowed amount of such claim; or

(B) with respect to an interest, if applicable, the greater of—

(i) any fixed liquidation preference to which the terms of any security representing such interest entitle the holder of such interest; or

(ii) any fixed price at which the debtor, under the terms of such security, may redeem such security from such holder.

ed to all the rights and remedies of the employees, including any rights of "cure" received by employees under Debtors' Plan. In support, Aetna relies on *In re Wingspread, Corp.*, 145 B.R. 784 (S.D.N.Y. 1992), *aff'd* 992 F.2d 319 (2d Cir.1993), where a debtor assumed certain leases. Prior to its assumption of the leases, a guarantor had satisfied the debt owed by the debtor on one of the leases. After assuming the leases, the debtor attempted to cure the defaults on the remaining leases, under § 365(b)(1),[10] which would give rise to a § 507(a)(2) administrative expense priority. *Id.* at 787. The debtor, however, did not offer a cure to the guarantor who had satisfied the other lessor's claim. The court found that when the guarantor satisfied the lessor's claim, it was subrogated to the rights of the lessor and was "entitled to assert any priority or special right of the [lessor]." *Id.* at 791. The guarantor who had satisfied the debt owed to the lessor was entitled to assert the same administrative expense priority under § 507(a)(2) as the lessor would have asserted if the guarantor had not paid its claim.

The *Wingspread* court noted that the debtor's other creditors were not harmed by the guarantor's assertion of the lessor's right to priority when the guarantor was allowed to "step into the shoes of priority creditors and ahead of other creditors," *Id.* at 791, because the other creditors retained the same position they would have had if the guarantor had not paid the claim. If the creditor had not been paid by the guarantor, the creditor would have been entitled to a cure of defaults under the lease. *Id.*

Debtors respond that *Wingspread* is not relevant to this case because there is no right to cure involved to which Aetna would be subrogated. Debtors maintain that the workers' claims are unimpaired based on § 1124(1), not on § 1124(2), the section relating to cure of defaults upon which Aetna bases its argument. Debtors

assert that individual workers have received and under its Plan will continue to receive the "legal, equitable, and contractual rights to which they are entitled" and are unimpaired under § 1124(1).

We agree with Debtors that *Wingspread* is not relevant to the matter before us because there is no right to cure; however, we reach this result for a different reason than that advanced by Debtors. In *Wingspread,* a debtor elected to assume leases. Under § 365(b)(1), the assumption of a lease triggers a debtor's obligation to "cure" or provide adequate assurance of a prompt cure of any defaults under the lease. Concomitantly, it triggers the lessor's or creditor's right to receive this cure.

On the other hand, the formation of a class does not trigger a right to cure. Section 1124 is not a section that provides a right to cure. It merely provides a method to analyze whether an already formed class may be considered unimpaired under a plan of reorganization. No "rights" are involved to which a surety or transferee may be subrogated.

Even if Debtors have defaulted in their obligation to pay certain workers, and Debtors decide, under their Plan, to pay these past due benefits, this cure is an elective action on Debtors' part, not required by any section of the Code. No rights are involved to which a surety or transferee may be subrogated. The individual workers did not have a "right" to this cure. Inasmuch as "one cannot acquire by subrogation what another whose rights he claims did not have," *United States v. Munsey Trust Co.*, 332 U.S. 234, 242, 67 S.Ct. 1599, 1603, 91 L.Ed. 2022 (1947), a transferee of the individual workers' claims does not acquire a right to cure.

As we noted earlier, the equality of treatment requirement of § 1123(a)(4) only re-

---

**10.** Section 365(b)(1) provides in relevant part:
(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default.

lates to "claims or interests placed in the same class." *Jersey, supra*, 817 F.2d at 1061. Thus, Aetna's workers' compensation claims are not entitled to this cure even if it is provided to render the separately classified individual workers' claims unimpaired.

Aetna argues that permitting the individual workers' compensation claims to be classified separately from Aetna's claims in order to offer the individual workers favorable treatment and then justifying the disparate treatment given Aetna on the grounds that the individual workers' claims are separately classified is a circular argument.

The individual workers' claims, however, are classified separately, not merely to provide favorable treatment but because there are valid business reasons to provide this disparate treatment, namely, to ensure the workers' continued cooperation and a successful reorganization. The justification to pay claims held by the individual workers in full does not apply to Aetna. The business reasons for appeasing the workers form the basis for permitting the separate classification of their claims. Thus, because the claims are separately classified based on legitimate business reasons, § 1123(a)(4) is not relevant and it is not required that the same treatment be conferred on Aetna's separately classified claims.

█ Finally, as part of a separate class which receives disparate treatment from the individual workers' claims, Aetna may only block confirmation of Debtors' Plan under § 1129(b) if it votes against Debtors' Plan, and proves that Debtors' Plan discriminates unfairly against its class or is not fair and equitable with respect to its class.[11]

At the hearing on classification held on May 5, 1993, with respect to Aetna's re-

quest that Debtors be required to establish a full claims reserve for Aetna's disputed claims, we indicated that if Debtors were permitted to classify the individual workers' claims separately from Aetna's claims, then Debtors only needed to reserve for Aetna's claims that amount which Debtors were required to pay to Aetna under Debtors' Plan. In accordance with our determination that the separate classification and treatment of the individual workers' compensation claims from Aetna's workers' compensation claims is reasonable and appropriate, we hold that a claims reserve in the amount Debtors are required to pay Aetna under Debtors' Plan is appropriate.

## CONCLUSION

The individual workers' compensation claims may be separately classified from Aetna's subrogation claims. The separate classification is required to ensure Debtors' successful reorganization. The proposed disparate treatment of the classes is reasonable in view of the vital role played by the individual workers, and not by Aetna, in Debtors' reorganization effort.

The appropriate claims reserve to establish pending a determination of the disputes related to Aetna's claims is an amount sufficient to make a distribution to Aetna based on a general unsecured claim.

Counsel for Debtors to settle the order.

---

**11.** This issue is not presently before us. We note, however, that Debtors have put forth a valid rationale for the disparate treatment of the individual workers' claims that does not apply to Aetna's claims and it is unlikely that Aetna can prove that the disparate treatment afforded the individual workers discriminates unfairly against Aetna.