In re CHATEAUGAY CORPORATION, Reomar, Inc., The LTV Corporation, et al., Debtors.

Bankruptcy Nos. 86 B 11270 (BRL) to 86 B 11334 (BRL), 86 B 11402 (BRL) and 86 B 11464 (BRL).
Nos. 93 Civ. 4726 (RPP), 93 Civ. 4964 (RPP) and 93 Civ. 5787 (RPP).

United States District Court, S.D. New York.

Jan. 13, 1995.

Gibson, Dunn & Crutcher by Mitchell A. Karlan, James P. Ricciardi, Robin L. Baker, New York City, for appellant Aetna Cas. & Sur. Co.

Kaye, Scholer, Rierman, Hays & Handler by Michael J. Crames, Edmund M. Emrich, New York City, for appellees Chateaugay Corp., et al.

Seward & Kissel by M. William Munno, New York City, for appellees LTV.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Appellant, The Aetna Casualty and Surety Company ("Aetna") appeals three separate orders of the Bankruptcy Court: (1) the May 14, 1993 order, issued by Bankruptcy Judge Conrad, denying administrative expense priority and excise tax priority to Aetna's claims for $38 million of workers' compensation payments it made to workers' compensation funds of various states upon the default of various of the debtors (the "Administrative Priority Order"); (2) the May 25, 1993 order, 155 B.R. 625, issued by Bankruptcy Judge Conrad, denying Aetna's motion for (a) a determination that the Aetna claims must be classified together with and treated in the same manner as the workers' compensation claims (the "Employee Claims") asserted by the employees of the LTV Corporation and its 66 affiliated reorganized debtors (the "Debtors") and (b) the establishment of a full value reserve for the Aetna Claims pending the ultimate resolution of the Debtors' objections to such claims, (the "Classification Order"); and (3) the May 26, 1993 order, issued by Bankruptcy Judge Lifland confirming Debtors' plan of reorganization (the "Plan"), (the "Confirmation Order"). Aetna asks that this Court reverse or modify the orders below to award Aetna reimbursement in full for its Workers' Compensation Claims.

## BACKGROUND

On July 17, 1986 (the "Filing Date"), the Debtors filed their petitions for reorganization under Chapter 11 of the United States Bankruptcy Code (Aetna Ex. D–1 at 2). After the Filing Date, Debtors continued to manage their businesses and properties as debtors-in-possession (id.). Because of their filings, Debtors would have had to cease paying all prepetition obligations, including the prepetition wages and salaries of their employees. Yet on the Filing Date, the Debtors applied for and Chief Bankruptcy Judge Lifland issued an order authorizing the Debtors to pay workers compensation claims that had been filed before the Filing Date (the "Wage Order"). The last paragraph of the Wage Order reads:

ORDERED, that the Debtors be, and they hereby are, authorized and empowered to pay all employees' workers' compensation, "black lung" and related benefits and claims which arose or accrued prior to the Filing Date.

Aetna Ex. D–21 at 3.

Prior to the Filing Date, Aetna had issued 262 surety bonds on behalf of certain of the Debtors to secure the Debtors' performance of certain obligations owed to various creditors. The surety bonds included workers' compensation bonds ("Workers' Compensation Bonds") securing payment of Debtors' obligations under the workers' compensation laws of six states (Kentucky, Minnesota, New York, Pennsylvania, Washington, and West Virginia—the "Bonded States"). Although Debtors were authorized by Judge Lifland's order of July 17, 1986 to pay prepetition workers' compensation benefits and claims, they stopped making payments for such benefits and claims to the workers' compensation funds of the Bonded States (Aetna Ex. D–1 at 6–13; Ex. D–21 at 3). When Debtors ceased paying the workers' compensation claims of their employees, Aetna, as surety, paid approximately $38 million for Debtors' prepetition workers' compensation claims in the Bonded States (Aetna Ex. D–1 at 7–13; D–6 (Ex. 3); Ex. D–7 (Ex. A); Ex. D–7 (Ex. F at 15, 16)).

On February 26, 1993, Debtors filed their proposed Plan. The Plan is a joint plan of reorganization for each of four Debtor groups (the Parent Group, the Steel Group, the Aerospace Group and the Energy Group) and a plan of liquidation for the fifth Debtor

Group (the AM General Group). Aetna Ex. D–39 at 3–4.

The Plan places all unpaid Employee Claims which have been asserted against the Parent Group, the Steel Group and the Energy Group into a single unsecured class within each such group (i.e., Classes 6.10, 6.20 and 6.50, respectively). Aetna Ex. D–38 at ¶ 2.22. Claims asserted by creditors which claim derivatively through the injured workers (e.g. sureties) are classified with all other general unsecured claims within each such Debtor Group (i.e., Classes 5.10, 5.20, and 5.50, respectively). *Id.* at ¶¶ 2.13, 2.14, 2.20.

This different classification results in unpaid employee claims being treated more favorably under the Plan than such claims asserted derivatively. While unpaid employee claims "will be paid the full amount thereof pursuant to, and as and when provided by, applicable law governing the payment of such Claims," *id.* at ¶ 3.8, claims which are asserted derivatively through the injured workers, such as the claims held by Aetna, "will be entitled to receive certificates evidencing such holder's Pro Rata share of the number of shares of New LTV Common Stock." [1] *Id.* at ¶ 3.6.

## I. Aetna's Claims

### A. Administrative Priority Claim and Order

On March 9, 1993, Aetna filed claims in Debtors' bankruptcy proceedings to recover the $38 million it paid under the Workers' Compensation Bonds (Aetna Ex. D–1 (Ex. A)), asserting that, as Workers' Compensation Claims, its claims were entitled to administrative expense priority and excise tax priority. *Id.*

Debtors moved to challenge the asserted priority status of Aetna's Workers' Compensation Claims and to reclassify those Claims as general unsecured claims. *See* Aetna Ex.

D–3. On April 15, 1993, Bankruptcy Judge Conrad denied granting administrative priority and excise tax priority to Aetna's Workers' Compensation Claims. Aetna Ex. D–10 at 20. On May 14, 1993, the Bankruptcy Court entered the Administrative Priority Order in accordance with its April 15 decision. Aetna Ex. D–19. Aetna filed its notice of appeal from the Administrative Priority Order on June 4, 1993.

### B. The Classification Order Claim

At the same time Aetna opposed Debtors' motion regarding the priority of Aetna's claims and cross-moved for the establishment of a full-value reserve, Aetna also filed its objection to Debtors' Plan. Aetna Exs. D–8, D–9. On May 18, 1993, the Bankruptcy Court issued its Memorandum of Decision on Separate Classification of Claims,[2] which held "that the workers' compensation claims asserted by the workers themselves may be separately classified from those asserted by the surety who acquired those claims by subrogation." *In re Chateaugay,* 155 B.R. at 627. The court further held "that Debtors[ ] are not required to reserve in full for the surety's general unsecured claim." *Id.*

On May 19, 1993, Aetna filed a notice of appeal from the Bankruptcy Court's decision and applied to the Bankruptcy Court for an emergency stay pending appeal. On May 20, the stay was denied. On the same day, Aetna made an emergency application to this court for a stay pending appeal which was denied by Judge Leisure. On May 21, Aetna filed a notice of appeal to the Second Circuit from Judge Leisure's order denying a stay and applied for a writ directing the Bankruptcy Court to issue an order requiring the establishment of a full-value reserve. On May 26, the Second Circuit entered an order denying Aetna's application. On May 25, 1993, the Bankruptcy Court entered the Classification Order in accordance with its Memorandum of Decision.

---

**1.** There is no dispute that the present value of the New LTV Common Stock is only a fraction of the amount of that Debtors' employees and former employees will be paid for their workers' compensation claims. Aetna claims that their worth is approximately 37 cents for every dollar in workers' compensation payments that Aetna made (Aetna Mem. at 9) while Debtors claim that

the total current value of Aetna's pro rata distributions is 44% on its claim dollar (Debtors' Opp. Mem. at 8).

**2.** This Classification Decision is reported at *In re Chateaugay,* 155 B.R. 625 (Bankr.S.D.N.Y.1993).

## C. The Confirmation Order

On May 26, 1993, an evidentiary hearing considering confirmation of the Plan proceeded as scheduled, and a Confirmation Order was entered by the Bankruptcy Court. Aetna Exs. D–44, D–43. On June 3, Aetna filed its notice of appeal from the Confirmation Order and an emergency application asking the Bankruptcy Court for a stay. On June 7, 1993, the Bankruptcy Court denied a stay, and Aetna filed an emergency application in this Court seeking an expedited appeal from the Bankruptcy Court's decision refusing to require Debtors to establish a full-value reserve and a stay pending appeal. On June 11, Judge Mukasey denied Aetna's application for relief. Aetna Ex. D–56. On June 14, Aetna filed a notice of appeal from Judge Mukasey's order and filed an emergency application in the Second Circuit seeking an expedited appeal and a writ directing the Bankruptcy Court to order Debtors to establish a full-value reserve. The Second Circuit expedited Aetna's appeal and ruled on November 29, 1993 that Aetna was not entitled to a full-value reserve, *In re Chateaugay Corp.,* 10 F.3d 944 (2d Cir.1993).

Aetna now seeks review of the Administrative Priority Order, the Classification Order and the Confirmation Order on the merits.

## II. Aetna's Arguments

Aetna argues that it is entitled to full payment of the Workers' Compensation Claims because of: (1) Aetna's claims are entitled to administrative expense priority; (2) Aetna's claims are entitled to excise tax priority; and (3) Debtors agreed in their Plan to pay their employees' workers' compensation claims in full and the Code does not permit different treatment of such claims now held by Aetna.

### A. Administrative Expense Priority

Aetna maintains that its claims were entitled to administrative expense priority based on any one of three arguments: (1) Aetna's payments under the Workers' Compensation Bonds were made to satisfy statutory requirements regulating public health and safety and are therefore entitled to be reimbursed in full as administrative expenses of

the estate; (2) failure to grant Aetna full reimbursement will unjustly enrich Debtors and give Debtors an impermissible advantage over their business competitors in violation of applicable bankruptcy law; and (3) because Debtors have, postpetition, assumed responsibility for making workers' compensation payments both in the Plan and in renegotiated collective bargaining agreements, all workers compensation claims, including those held by Aetna, should be given priority as administrative expenses.

### 1. Public Health and Safety

■ Aetna claims that its payments to fulfill Debtors' workers' compensation obligations are entitled to full reimbursement as administrative expenses because these funds were expended to remediate Debtors' breach of statutes regulating public health and safety. Aetna contends that its payments of Debtors' workers' compensation claims are analogous to postpetition environmental cleanup claims that have been given administrative priority and that the logical extension of *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) ("*Midlantic* ") and *In re Chateaugay Corp.,* 944 F.2d 997 (2d Cir.1991) ("*Chateaugay 1991* ") grants their claims administrative priority. However, the holdings in *Midlantic* and *Chateaugay 1991* do not require such a result.

These cases are distinct from the case at bar in that both *Midlantic* and *Chateaugay 1991* were cases in which the government was able to point to specific "identifiable hazards" that might endanger "public health and safety," i.e., hazardous, toxic waste.

In *Midlantic,* a corporation that processed waste oil at two facilities had been found to have violated a specific prohibition in its operating permit by accepting more than 400,-000 gallons of oil contaminated with PCB, a highly toxic carcinogen, at their New Jersey facility. Five months later, the corporation filed for bankruptcy and ultimately for a liquidation proceeding under Chapter 7. After filing for bankruptcy, the corporation was found to have accepted and stored over 70,-000 gallons of toxic, PCB-contaminated oil in

deteriorating and leaking containers at their New York facility. The trustee for the bankrupt corporation notified creditors and the Bankruptcy Court of its intention to abandon the properties pursuant to § 554(a) of the Bankruptcy Code, 11 U.S.C. § 554(a).[3]

The Supreme Court held that "a trustee [in a bankruptcy] may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety *from identified hazards.*" *Midlantic*, 474 U.S. at 507, 106 S.Ct. at 762–63 (emphasis added). The Court added that "[t]his exception to the abandonment power ... is a narrow one," *id.* at n. 9, and that the laws and regulations to which it applies must be "reasonably calculated to protect the public health or safety from *imminent and identifiable harm.*" *Id.* (emphasis added). In *Midlantic*, this "identified hazard" was a processed waste oil facility that had accepted oil contaminated with a toxic carcinogen in deteriorating and leaking containers.

In a logical expansion of *Midlantic*, the Second Circuit in *Chateaugay 1991* held that postpetition remediation of environmental hazards emanating from prepetition releases of hazardous waste were entitled to administrative priority. The Second Circuit affirmed the reasoning of the District Court by stating that "[i]f property on which toxic substances pose a significant hazard to public health cannot be abandoned, it must the[n] follow ... that expenses to remove the threat posed by such substances are necessary to preserve the estate." *Chateaugay 1991*, 944 F.2d at 1010. As in *Midlantic*, *Chateaugay 1991* also specifically identified a hazard that posed a significant danger to public health: property on which there was a release or threatened release of toxic waste.

In the case at hand, Aetna is not able to specify a similar "identified hazard" that would pose a similar danger to the safety or health of the public at large. Although the reasoning in *Midlantic* may be applied to claims that do not involve environmental cleanups, Petitioners were unable to cite any

cases in which this has been done. Although workers' compensation laws ensure that injured employees receive restitution for injuries, this is not the type of "identified hazard" that would suggest a similar risk to the health and safety of the general public as would property that contains hazardous, toxic waste products.

*Midlantic* and *Chateaugay 1991* do not overturn this court's decision in *In re REA Express, Inc.*, 442 F.Supp. 71 (S.D.N.Y.1977), *aff'd*, *St. Paul Fire & Marine Ins. Co. v. REA Express, Inc.*, 591 F.2d 1332 (2d Cir. 1978) which is squarely on point in the case at bar and holds that in a Chapter 11 arrangement, workers' compensation payments paid on behalf of the debtor in possession to employees for prepetition injuries should not be classified as an administrative expense. *REA*, 442 F.Supp. at 74.

### 2. Unjust Enrichment

■ Aetna claims that Debtors' bankruptcy estates were unjustly enriched at the expense of the Bonded States, Aetna, and other sureties, and therefore Debtors enjoyed an unfair competitive advantage over other businesses that contemporaneously incurred and paid those similar expenses while operating in the Bonded States. Aetna asks this Court to look at equitable considerations and to give administrative priority to Aetna's Workers' Compensation claims in order to prevent unjust enrichment to the Debtors' estate. This unjust enrichment claim must be rejected; there is nothing inequitable in denying administrative priority to a surety which was compensated by the premium it charged for the risk of the debtor's default.

This court has encountered this situation before. In *In re REA*, Judge Greisa specifically addressed "the theory that REA should be held on equitable grounds to be continually responsible, after a Chapter XI proceeding is filed, for the payment of workmen's compensation claims" and found that "[i]t is clear that equitable considerations may not be relied upon to vary the strict priorities set out

---

**3.** Section 554(a) reads:

After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value to the estate.

in Section 64a." *REA*, 442 F.Supp. at 74, citing *I.C. Herman & Co. v. Taub, Hummel & Schnall, Inc.*, 497 F.2d 1301, 1303 (2d Cir.), *cert. denied* 419 U.S. 885, 95 S.Ct. 153, 42 L.Ed.2d 125 (1974). The court further explained "The compensation claimants were protected during the Chapter XI proceeding by REA's surety bond, and suffered no inequity. The surety itself suffers no inequity from being required to bear the risk of REA's insolvency, since the surety has been paid to assume such risk." *REA*, 442 F.Supp. at 74. In the same way, Aetna was paid a premium to perform its obligations under the Bonds; it was contractually bound to make such payments; and this Court should not alter the strict priority provision of Section 64 of the Bankruptcy Act, 11 U.S.C. § 104, to see that Aetna's claims are reimbursed.

### 3. Post-petition Obligation

■ Aetna's third argument is that Debtors incurred liability for these workers' compensation claims postpetition and received a postpetition benefit and therefore Aetna is entitled to administrative priority status. Aetna emphasizes that as part of their renegotiated collective bargaining agreements and their Plan, Debtors assumed liability for prepetition workers' compensation claims and that these postpetition assumptions were actual and necessary costs of preserving Debtors' estates, making these claims eligible for administrative priority status under 11 U.S.C. § 503(b).

■ However, this final attempt by Aetna to establish administrative priority status is also unpersuasive. The test for whether a claim qualifies for payment as an administrative expense is set forth in *In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir.1976). In *Mammoth Mart*, the court stated that a claimant must prove that the debt (1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (or, alternatively, that the claimant provided consideration to the debtor-in-possession); and (2) directly and substantially benefitted the estate. *Id.* at 954. In the case at bar, Aetna's claims arise out of prepetition Bonds and relate to prepetition injuries to the Debt-

ors' workers. Aetna argues that because continuation of the payments to the workers' compensation funds was a critical component of the renegotiated postpetition collective bargaining agreement Aetna's payments constituted consideration to the debtor-in-possession and should therefore be considered an administrative expense; however, Aetna's obligations to make such payments for workers' compensation obligations arose out of prepetition occurrences in connection with the renegotiation of the collective bargaining agreements. It cannot be stated that debt arose from a transaction with the Debtors-in-possession. Thus, Aetna's payments were required due to prepetition agreements. Aetna did not, therefore, provide nor did the Debtors receive the benefit of any new consideration.

■ It is clear that "[a] debt is not entitled to priority simply because the right to payment arises after the debtor in possession has begun managing the estate." *Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir.1986). In the case at bar, Aetna's obligations to make payments, like the agreements to pay the "withdrawal liability" incurred under the Multiemployer Pension Plan Amendments Act (MPPAA) in *McFarlin's* and the rights to indemnification under the safe-harbor leases in *In re Chateaugay*, 10 F.3d 944 (2d Cir. 1993), were entered into pre-petition and provided no benefit to the debtors-in-possession since Aetna's payments were not in settlement of any claims the debtors-in-possession had assumed. Rather Aetna was "merely subjected ... to the kind of unfairness that Chapter 11 evenly distributes among similarly situated creditors." *In re Chateaugay*, 10 F.3d at 956, and its claims are not entitled to administrative priority.

### B. Excise Tax Priority

■ Under § 507(a)(7)(E) of the Bankruptcy Code, prepetition excise tax claims of "governmental units" are granted priority ahead of all general unsecured claims but after certain other types of priority claims. Aetna claims that because Debtors' workers' compensation obligations to the Bonded States falls within the Code's definition of

excise taxes and because Aetna paid these obligations, it is now subrogated to the rights and priority status of the Bonded States who would have paid these obligations.[4] Therefore, Aetna concludes that its workers' compensation claims are entitled to excise tax priority

§ 507(a)(7)(E) states:

**§ 507. Priorities**

(a) The following expenses and claims have priority in the following order:

.    .    .    .    .

(7) Seventh, allowed unsecured claims of governmental units, only to the extent that such claims are for— ...

(E) an excise tax on—(i) a transaction occurring before the date of the filing of the petition ...

In order to determine whether Aetna's payment of the workers' compensation claims in Minnesota, New York, West Virginia and Washington should be given excise tax priority, this Court must find that (1) the payment of workers' compensation claims is indeed an "excise tax" under § 507(a)(7)(E); and (2) that subrogee claims for payment of "excise taxes" are entitled to the same priority that is received by the government units involved.

■ The Code does not define "tax" as used in § 507; rather to determine whether an obligation to make payments to a governmental unit is tax under the Code is a question of federal law. *City of New York v. Feiring,* 313 U.S. 283, 285, 61 S.Ct. 1028, 1029, 85 L.Ed. 1333 (1941). Courts have defined taxes, for the purpose of bankruptcy cases, as the Supreme Court did in *Feiring:* "those pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it." *Id., see New Neighborhoods, Inc. v. West Virginia Workers' Compensation Fund,* 886 F.2d 714, 720 (4th Cir. 1989); *In re Chateaugay,* 154 B.R. 416, 420

(S.D.N.Y.1993); *In re Chateaugay,* 153 B.R. 632, 637 (Bankr.S.D.N.Y.1993).

■ This definition has been further explicated by the four-prong test set forth in *In re Lorber Indus. of California, Inc.,* 675 F.2d 1062, 1066 (9th Cir.1982). Under the *Lorber* test, all four of the following elements must be present in order for an obligation to qualify as a tax:

(1) An involuntary pecuniary burden, regardless of name, laid upon individuals or property;

(2) Imposed by, or under authority of the legislature;

(3) For public purposes, including the purposes of defraying expenses of government or undertakings authorized by it;

(4) Under the police or taxing power.

*Id.* at 1066.

This Court recently applied the *Lorber* test to assess whether contributions required under the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 1, 9701 *et seq.* (the "Coal Act"), was entitled to excise tax priority under 11 U.S.C. § 507(a)(7)(E). *In re Chateaugay Corp.,* 154 B.R. 416, 421 (S.D.N.Y.1993). Judge Martin held that "the Coal Act obligations are appropriately described as 'taxes' due to their overwhelmingly involuntary nature, their explicitly stated public purpose, and their obvious potential to be imposed pursuant to the taxing power". *Id.* at 422. The Court further noted that "mandatory contributions to a state insurance fund under a workman's compensation scheme were found to constitute taxes." *Id.* at 421 (citing *In re Pan American Paper Mills, Inc.,* 618 F.2d 159, 161–62 (1st Cir. 1980)).

Applying the *Lorber* qualifications, Debtors' workers compensation obligations must be considered "involuntary pecuniary obligations." *Lorber,* 675 F.2d at 1066. In each of the Bonded States, Debtors were required to participate in the workers' compensation

---

4. Subsequent to argument, Aetna's Counsel acknowledged that the states of Kentucky and Pennsylvania would not have been required to make compensation payments to Debtors' injured workers if Aetna had not done so, nor would those states have the right to be reim-

bursed by Debtors for any such payments. Therefore, Aetna's argument that Aetna is subrogated to the rights of the Bonded States no longer applies to claims for workers' compensation payments made in Kentucky or Pennsylvania.

scheme and to pay benefits either through insurance or through contributions to the State's workers' compensation funds. *See* Minn.Stat. § 176.181 (1993); N.Y.Work. Comp.Law § 10 (McKinney 1992); *id.* § 50 (McKinney 1965 and Supp.1994); Wash.Rev. Code § 51.41.010 (1992); W.Va.Code § 23–2– 5 (1993). If Debtors had failed to comply with their workers' compensation schemes, they could have been subjected to penalties ranging from an injunction against the employment of workers to criminal sanctions. *See* Minn.Stat. §§ 176.181, subdv. 3, 176.194; N.Y.Work.Comp.Law § 52; Wash.Rev.Code §§ 51.48.010, 015, 103; W.Va.Code § 23–2–5. Therefore, the first prong of the *Lorber* test is satisfied.

The second and fourth prong of the *Lorber* test are likewise satisfied since Debtors' workers' compensation obligations were "imposed by … the legislature … [u]nder the police or taxing power of the state." *Lorber*, 675 F.2d at 1066. The obligations were created by each state's statutory workers' compensation scheme. *See* Minn.Stat., ch. 176; N.Y.Work.Comp.Law § 1–App. § 430.12; Wash.Rev.Code, tit. 51; W.Va.Code, ch. 23.

Also, workers' compensation obligations are imposed "[f]or public purposes", thus satisfying the third prong of *Lorber*. The public purpose of a worker's compensation scheme "is to allocate the burden of the costs of injured employees and/or of their dependents among employers rather than among the general public." *New Neighborhoods, Inc. v. West Virginia Workers' Compensation Fund*, 886 F.2d 714, 719 (4th Cir.1989).

■ Since, under case law, workers' compensation obligations of Debtors must be considered "taxes" entitled to priority status under § 507(a)(7)(E), the issue next to be addressed is whether the claims of subrogees who paid those "taxes" are entitled to the same status.

When the Code was enacted in 1978, a subrogee who had paid claims entitled to "tax" priority rights under Section 507(a)(6) was not entitled to succeed to those priority rights pursuant to Section 507(d) of the Bankruptcy Code.

According to § 507(d),

An entity that is subrogated to the rights of a holder of a claim of a kind specified in subsection (a)(3), (a)(4), (a)(5), or (a)(6) of this section is not subrogated to the right of the holder of such claim to priority under such subsection.

With the enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984 (the "1984 Amendments"), Congress altered the priority scheme embodied in Section 507(a) and granted a new fifth priority status on certain claims of grain producers and fishermen. The insertion of a new fifth priority caused Congress to renumber the subsections of Section 507(a) so that Section 507(a)(6) which had granted priority for certain claims of governmental units for certain types of taxes including excise taxes then became Section 507(a)(7). However, Section 507(d) was not similarly renumbered to reflect the changes in Section 507(a). Several courts and scholars have found that this omission was the result of "a perceived mistake in congressional drafting." *See Creditor's Committee v. Massachusetts Dep't of Revenue*, 105 B.R. 145, 148 (D.Mass.1989).

*Collier on Bankruptcy* states

Section 507(d) bars priority status with respect to subrogated claims which would otherwise receive priority. Such priority extends to claims which receive a wage priority under section 507(a)(3), priority for contribution to employee benefit plans under section 507(a)(4), consumer credit priority under section 507(a)(6) (erroneously referred to in the statute as section 507(a)(5)) or *tax priority under section 507(a)(7) (erroneously referred to in the statute as section 507(a)(6)). Congress, in enacting the 1984 Amendments, failed to correct the cross-references to section 507(a) that appear in other Code provisions to account for the 1984 Amendments* …

3 *Collier on Bankruptcy* ¶ 507.07 (15th ed. 1993).

Courts who have examined this issue have consistently held that 507(d) covered subsection (a)(7). *See Creditor's Committee v. Massachusetts Dep't of Revenue*, 105 B.R. at 149–51; *In re Brickel Associates, Inc.*, 170 B.R. 140, 142–43 (Bankr.W.D.Wis.1994); *In re Henzler Manufacturing Corp.*, 89 B.R. 655, 657 (Bankr.N.D.Ohio 1988); *In re Trasks' Charolais*, 84 B.R. 646, 652 n. 9

(Bankr.D.S.D.1988); *In re Tentex Marine, Inc.*, 83 B.R. 530, 534 (Bankr.W.D.Tenn. 1988); *In re Gaumer*, 83 B.R. 3, 4 (Bankr. S.D.Ohio 1988); *In re Barefoot Sports, Inc.*, 61 B.R. 546, 548 n. 2 (Bankr.W.D.Wis.1986).

■ In reviewing the legislative history of Section 507, courts have uniformly concluded that Congress had not expressed any clear intent to change the substantive provisions of Section 507(d) in either its 1984 or its 1986 amendments to the Bankruptcy Code. *Creditor's Committee v. Massachusetts Dep't of Revenue*, 105 B.R. at 150; *In re Gaumer*, 83 B.R. at 4; *In re Barefoot Sports, Inc.*, 61 B.R. at 548, n. 2. *See also* 1984 Amendments, Pub.L. No. 98–353, 98 Stat. 333, 358–89 (1984); 1987 U.S.C.C.A.N. 489, 576–606. Absent such clear intent, courts have relied on the presumption that "repeals of judicial constructions of legislation are usually required to be clear and manifest." *In re Missionary Baptist Found. of America*, 667 F.2d 1244, 1246 (5th Cir.1982). Consequently, courts have consistently denied priority status to subrogees making claims under Section 507(a)(7).

Consistent with the interpretation of courts and scholars, Congress amended Section 507 with a small amendment in the Bankruptcy Reform Act of 1994 (the "1994 Act").

> (11) in section 507, as amended by section 304— ... (B) in subsection (d) by striking "or (a)(6)" and inserting "(a)(6), (a)(7), (a)(8), or (a)(9)",

By amending Section 507, Congress remedied their earlier oversight. Aetna argues, however, that the legislation which amended, *inter alia*, Section 507(d) is not intended to be applied to Chapter 11 cases pending on the effective date, i.e., October 22, 1994, of the 1994 Act. This assertion is not dispositive of the matter at hand. The

amendments to Section 507 were only a small component of legislation which was passed affording comprehensive substantive changes relating to the protection of child support and alimony, as well as other technical amendments relating to the Bankruptcy Code. Although substantive changes embodied in the 1994 Act should not be given retroactive effect, to apply the effective date of such legislation to a drafting error correction and thus overturn a generally accepted interpretation of Section 507 seems perverse. Such action by the Court would "produce a result demonstrably at odds with the intentions of its drafters." *See United States v. Ron Pair Enter. Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)) (plain meaning of statute is conclusive except in instances in which "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.")

Therefore, although Debtors' workers' compensation claims are entitled to be considered "excise taxes" entitled to priority under 11 U.S.C. § 507(a)(7), claims of a subrogee arising out of payment of "excise taxes" are not entitled to a priority in accordance with 11 U.S.C. § 507(d).

### C. Classification of Aetna's Claims Separately from Employee's Claims

■ Aetna asserts that it has the same rights and preferences as employees who hold workers' compensations claims under the Plan and that any attempt to divest Aetna of such rights and preferences through classification violates Sections 509 and 1122 of the Bankruptcy Code. Aetna asserts that when it paid the workers' compensation benefits to the workers, it became subrogated to their rights. Therefore, Aetna argues that it should be placed in the same class and receive the same treatment as the individual workers' compensation recipients, as provided in 11 U.S.C. § 1122[5] and 11 U.S.C. § 1123(a)(4)[6].

---

**5.** 11 U.S.C. § 1122 relating to classification of claims or interests states:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

> (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

**6.** 11 U.S.C. § 1123(a)(4) provides in relevant part:

However, the narrow interpretation of 11 U.S.C. § 1122 that Aetna urges is contrary to the plain language of the statute, as well as analysis by this Circuit and other authority. As the Third Circuit stated in *Matter of Jersey City Medical Center*, 817 F.2d 1055, 1060 (3d Cir.1987), "The express language of [11 U.S.C. § 1122(a)] explicitly forbids a plan from placing dissimilar claims in the same class; [§ 1122(a)] does not, though, address the presence of similar claims in different classes." The Third Circuit also noted that "it remains clear that Congress intended to afford bankruptcy judges broad discretion to decide the propriety of plans in light of the facts of each case." *Id.* at 1060–61.

■ Furthermore, the Second Circuit has held in these same Chapter 11 proceedings that where a rational basis exists to do so, a plan of reorganization may classify separately and treat differently claims that are similar. *In re Chateaugay*, 10 F.3d at 956–57.

Although Aetna insists that its claims are not "similar" but rather that they are "identical" to the claims of the employees of the Debtors, they cite no authority to that effect. In fact, as the Bankruptcy Court found, "Section 509(c) provides a basis to distinguish the claims of the individual workers from the workers' compensation claims held by Aetna because Aetna's entitlement to receive payment on its claims is subject to a condition not applicable to the individual workers, i.e., Aetna's claims and rights are subordinate to the claims and rights of each employee until that employee is paid in full on its claim." *In re Chateaugay*, 155 B.R. at 633.

As the Bankruptcy Court found in the decision below, Section 509(c) specifically addresses the different and competing claims held by a creditor and a surety: "The court shall subordinate to the claim of a creditor ... an allowed claim ... of an entity that is liable with the debtor on ... such creditor's claim, until such creditor's claim is paid in full, either through payments under this title or otherwise." 11 U.S.C. § 509(c).

Section 509(c) of the Code recognizes a distinction between Aetna's claims and the claims of Debtors' injured employees and it is this legal distinction that prevents Aetna's claims from being dubbed "identical" to the claims of injured employees.

■ This does not mean, of course, that debtors may classify creditors in any way they choose. As the Sixth Circuit warned in *Teamsters National Freight Ind. Negotiation Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.)*, 800 F.2d 581, 586 (6th Cir.1986), "there must be some limit on the debtor's power to classify creditors.... The potential for abuse would be significant otherwise." If a plan for reorganization "unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic priority rights, the plan cannot be confirmed." *Travelers Insurance Co. v. Bryson Properties, XVIII (In re Bryson Properties XVIII)*, 961 F.2d 496, 502 (4th Cir.) (citations omitted), *cert. denied* — U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992).

This, however, is not the situation in the case at bar. Rather, Debtors claim and the Bankruptcy Court found that there are compelling business reasons to separately classify the claims and favor the workers' claims; these compelling business justifications do not apply to Aetna. The favored treatment afforded workers is an acknowledgement of the fact that while cooperation of the workers is viewed as an absolute necessity for the viability of the restructured company, Aetna has no role in the reorganization. As Judge Mukasey found in connection with Aetna's motion for a stay pending appeal of various orders of the Bankruptcy Court, including

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—
(4) provide the same treatment for each claim or interest of a particular class, unless

the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.

the Classification Order, "In order to have a successful reorganization, it is essential to have the cooperation of employees. It is not essential necessarily to have Aetna's cooperation." *See* App. to Debtors' Opp.Mem. at 39–40. Debtors had offered evidence of grave consequences when they had ceased paying employee benefits in the past. The Bankruptcy Court found that "[a]ny perceived labor-management discord would lead to Debtors' inability to secure favorable sales contracts." *In re Chateaugay,* 155 B.R. at 632. This was not found to be true, however, if Debtors did not reimburse Aetna for its workers' compensation payments.

Thus, the evidence indicates that the interests of Aetna are distinct from and "in a different posture" than the interests of the individual workers, *see U.S. Truck,* 800 F.2d at 587. This, in turn, provides the basis for separately classifying the claims. Because of this business justification, the Classification Order of the Bankruptcy Court must be affirmed.

For the reasons stated above, the Administrative Priority Order, the Classification Order and the Confirmation Order of the Bankruptcy Court are affirmed.

IT IS SO ORDERED.