**In re OLGA COAL COMPANY, Debtor.**

**Bankruptcy No. 87B10288 (BRL).**

United States Bankruptcy Court,
S.D. New York.

April 12, 1996.

Reid & Priest, LLP by Martin G. Bunin, New York City, for Joel Lewittes, Chapter 11 Trustee of Olga Coal Company, Debtor.

Richard S. Stephenson, Charleston, W.Va., for West Virginia Workers' Compensation Division.

### DECISION ON TRUSTEE'S OBJECTION TO CLAIM OF WEST VIRGINIA WORKERS' COMPENSATION FUND

BURTON R. LIFLAND, Bankruptcy Judge.

The Chapter 11 Successor Trustee (the "Trustee") of Olga Coal Company (the "Debtor") requests this court to determine

whether proofs of claim, filed by the State of West Virginia Workers' Compensation Division (the "State" or the "Fund"), are entitled to administrative or tax priority status pursuant to 11 U.S.C. 503(b) and/or 507(a)(8)(E) [1] of the Bankruptcy Code (the "Code"). As a result of actuarial analyses and settlement discussions, the parties are in agreement that the State shall have an allowed claim against the Debtor for $3,477,000. A hearing was held to determine whether the State's claims warrant priority status. As a result of the hearing and post-trial submissions by the parties, the court finds that the State's claims are entitled, in part, to tax priority status.

### *Facts*

### The Debtor

The Debtor, an affiliate of LTV Steel Company, Inc. ("LTV"), was engaged in the business of bituminous coal mining, primarily at a mine located in McDowell County, West Virginia. Due to financial problems associated with the relationship of coal production costs to the market price of coal, the Debtor ceased operation of the McDowell mine in December 1986 and, on February 19, 1987, filed a petition for relief under Chapter 11 of the Code (the "Petition Date"). William H. Tucker was appointed the Chapter 11 Trustee on March 6, 1987. He resigned and was succeeded by Joel Lewittes, Successor Trustee (the "Trustee").

The State seeks priority reimbursement for awards it has paid to employees since the Petition Date which relate to pre-petition injuries.[2] Because the Debtor ceased its mining operations approximately two months prior to the Petition Date, there is no dispute that the injuries forming the basis of and giving rise to the State's claims occurred prepetition.

### West Virginia's Workers' Compensation System

The West Virginia Workers' Compensation Statute (the "Statute") requires employers in West Virginia to fund the payment of workers' compensation benefits. Unlike most states, West Virginia does not allow employers to meet this obligation through private insurance. Rather, the Statute provides two funding methods: 1) an employer may subscribe and pay premiums to the State Fund (the "Fund") (a "Subscriber"), or 2) may be authorized to self-insure and pay injured employees directly (a "Self–Insurer"). *See* W.Va.Code 23–2–9 (1988).

The premiums which a Subscriber must pay to the Fund are calculated as a percentage of the employer's payroll at a rate determined by the workers' compensation division. Rates are set to reflect the nature of the business and the degree of hazard. *See* W.Va.Code 23–2–4 (1988). Employee claims are filed with and processed by the Fund. The Fund pays benefits to employees of Subscribers directly. *See* W.Va.Code 23–2–5 (1988).

The only other funding option available to West Virginia employers is to seek authorization to be self-insured. Self-insured status is limited. Employers must first demonstrate that they are "of sufficient financial responsibility to ensure the payment of compensation to injured employees and the dependents of fatally injured employees." W.Va.Code 23–2–9 (1988). Demonstrating this requires the employer to, *inter alia,* post a bond with the Fund sufficient to compel or secure payment of all compensation benefits and expenses that may be incurred as a result of injury to employees. *Id.* Additionally, the employer must pay to the Fund a proportional share of various expenses, including the expense of administering the Fund; premiums of delin-

---

1. I note that pursuant to the Bankruptcy Reform Act of 1994 section 507(a)(7)(E) has been redesignated 507(a)(8)(E). While most of the case law interpreting this provision refers to the old statute I will refer to it throughout this decision as the newly codified section 507(a)(8)(E).

2. It is the position of the State that, "[c]urrent provision of medical care arising from the old injury prompts a new award. A death found to

be caused, resulting from, or directly related to the natural progression of an old injury or occupational disease is defined as a new award arising from the injury ... [u]pon each award, an assessment payorder is issued to the self-insured or issued to the [State] in the case of a subscriber. In case of default, the [State] is required ... to pay the order for the benefit of the claimant". (State's Response and Memo in Opp. at 6, 16).

quent employers and a sum sufficient to pay his fair portion of the costs of the disabled worker's relief fund. *See* W.Va.Code 23–2–9. This obligation has been referred to as a "self-insurance premium". (T. Huffman, *A Guide to Self–Insurance under the West Virginia Workers' Compensation System*, 96 W.Va.L.Rev. 781 (1994)).

A Subscriber seeking to change its status to Self–Insured must, in addition to demonstrating financial ability as set forth above, have paid premium as a Subscriber in an amount greater than the total benefits paid by the Fund on account of injury or death to employees. *See* Rules and Regulations of the Workmen's Compensation Fund, State of West Virginia ("Rules and Regs") at 4.02(a). Additionally, such change in status requires the Self–Insurer to assume liability on all awards made after the effective date of self-insurance in respect to claims for an injury or death which may have occurred prior to that date. *Id.* at 4.02(b). As with Subscribers, employee claims are filed with and processed by the Fund. The Fund issues a pay order directing the self-insured employer to pay benefits to the employee.

The failure of a Subscriber or Self–Insurer to meet their workers' compensation obligations results in various consequences. For example, defaulting employers may be subject to civil suit commenced by the State; all unpaid obligations become obligations immediately due and owing and a lien enforceable against all property of the employer; and the state may distrain upon personal property of the employer. *See* W.Va.Code 23–2–5a(a)–(c) (1988). A non-complying self-insurer can be deprived of its status and required to make premium payments as a subscriber. *See New Neighborhoods, Inc. v. West Virginia Workers' Compensation Fund (In re New Neighborhoods)*, 886 F.2d 714 (4th Cir.1989); *See also, UMWA v. Lewis*, 172 W.Va. 560, 309 S.E.2d 58, 65 (1983).

Finally, defaulting employers are subject to common law tort suits by employees and lose the common law defenses of fellow-servant rule, assumption of risk and contributory negligence. *See New Neighborhoods*, 886 F.2d at 717 (*citing* W.Va.Code 23–2–8 (1988)).

### Debtor's Funding History

Prior to July 1, 1976, the Debtor was a Subscriber (the "Subscriber Period"). It is undisputed that during this period, the Debtor paid all required premiums to the Fund.

For ten years thereafter, between July 1, 1976 and June 30, 1986, the Debtor was a Self–Insurer (the "Self–Insured Period"). Pursuant to Statute, the Debtor arranged for Aetna Casualty and Surety Co. ("Aetna") and Insurance Company of North America ("INA") to post adequate bonds (the "Bonds").[3] Aetna and INA thereby bound themselves to pay the Debtor's workers' compensation obligations to the Fund in the event the Debtor failed to timely do so. It is undisputed that during the Self–Insured Period, the Debtor paid all required benefits to its employees as well as its "self-insurance premium". Additionally, pursuant to the Statute, the Debtor assumed liability on all awards made after July 1, 1976, the effective date of self-insurance, in respect to claims for injuries or deaths which occurred during the Subscriber Period.

On July 1, 1986, the Debtor ceased being a Self–Insurer and resumed coverage as a Subscriber (the "Post–1986 Subscriber Period"). It is undisputed that the Debtor paid all required premiums during this time. The Bonds, previously posted to secure the Debtor's self-insurance obligations, remained extant and continued to act as security for the payment of claims arising from the Self–Insured Period.

On the Petition Date, the Debtor ceased paying claims arising from the Self–Insured Period. To the extent the applicable Bonds

---

**3.** Specifically, INA issued one bond in the amount of $1,000,000 covering the initial two year period from July 1, 1976 through June 30, 1978. For the remaining eight year period, Aetna issued three bonds: a $1,000,000 bond covering July 1, 1978 through June 30, 1979; a $1,000,000 bond covering July 1, 1979 through June 30, 1982; and a $2,000,000 bond covering July 1, 1982 through June 30, 1986. These bonds were issued on behalf of the Debtor and Youngstown Mines Corporation, one half of which was deemed applicable to Debtor and one half to Youngstown Mine Corp. (Proof of Claim at 2).

were not exhausted, Aetna and INA paid these claims. The State paid and continues to pay those claims which neither the Debtor, Aetna nor INA paid.

**Proofs of Claim**

Aetna and INA filed proofs of claim against the Debtor asserting subrogation rights for payments made under the Bonds and seeking administrative and/or tax priority status pursuant to sections 503(b) and 507(a)(8)(E). After objection by the Trustee and pursuant to stipulation, Aetna was granted an allowed, unsecured, non-priority claim in the amount of $1,502,725.07, subject to increase for additional amounts paid under its' Bonds. INA's claim was fixed as an unsecured, non-priority claim for $177,830.66.

**The State's Claim**

The subject of this decision is the proof of claim filed by the State against the Debtor and LTV, asserting priority status pursuant to 503(b) or 507(a)(8)(E) of the Code (the "Proof of Claim"). Generally, the Proof of Claim seeks reimbursement for "awards and periodical payment assessment orders" which occurred post-petition but which are based upon and arise from pre-petition injuries. (Response and Memo in Opp. at 3). Specifically, the Proof of Claim seeks two types of reimbursement; first, reimbursement for awards amounting to $26,295.04 which the State paid on the Debtor's behalf arising from injuries which occurred before July 1, 1976 when the Debtor was a Subscriber (the "Subscriber Claim") and second, reimbursement for awards amounting to more than $869,318.34 which the State has paid and continues to pay on the Debtor's behalf arising from injuries which occurred during the Self–Insured Period; (the "Self–Insurance Claim").[4]

**Discussion**

■ Priorities in claim distribution are scheduled pursuant to section 507 of the Code. This schedule is designed "to assure payment, if possible, to certain classes of claims by requiring that they be first paid before others are satisfied." *See* Lawrence P. King, 3 *Collier On Bankruptcy* 507.02[1] (15th ed. 1996). Here, the State is seeking first or eighth distribution priority for its claims. Section 507 provides, in relevant part,

(a) The following expenses and claims have priority in the following order:

(1) First, administrative expenses allowed under 503(b) ...

(8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for—(E) an excise tax on ... (ii) ... a transaction occurring during the three years immediately preceding the date of the filing of the petition.

11 U.S.C. 507(a)(1), (8).

■ "Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed." *Trustees of Amalgamated Ins. Fund v. McFarlin's Inc.*, 789 F.2d 98, 100 (2d Cir.1986) (*citing Joint Indus. Board v. U.S.*, 391 U.S. 224, 228, 88 S.Ct. 1491, 1493, 20 L.Ed.2d 546 (1968)). "[I]f one claimant is to be preferred over others, the purpose should be clear from the statute." *Trustees of Amalgamated Ins. Fund*, 789 F.2d at 101 (*quoting Nathanson v. N.L.R.B.*, 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952)).

**Administrative Priority**

■ To garner first priority as an administrative expense, the State's claim must be for "actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case ..." 11 U.S.C. 503(b)(1)(A). The issue of whether an expense is administrative is narrowly construed because such claims are paid ahead of all others. *See In re R.H. Macy & Co.*, 170 B.R. 69, 76 (Bankr.S.D.N.Y.1994) (stating

---

4. Specifically, the State Fund paid $9,447.78 for the period July 1, 1978 through June 30, 1979 which Aetna did not reimburse; paid $81,386.27 for the period July 1, 1979 through June 30, 1982 of which Aetna has reimbursed $45,317.29; paid $611,911.30 for the period July 1, 1982 and June 30, 1986 of which Aetna has reimbursed the State Fund $430,580.58; and paid $140,277.95 for the period July 1, 1976 through June 30, 1978 which INA did not reimburse. (Proof of Claim at 2).

that "[i]t is well settled that claims for 'administrative expense priority should be narrowly construed to include only those creditors that perform services that are actual and necessary to preserve the bankrupt estate or that enable it to maintain its business'") (*quoting In re CIS Corp.,* 142 B.R. 640, 642 (S.D.N.Y.1992)). Based upon the reasoning set forth below, I find that while the State's claim is for awards paid post-petition, such awards were based on and arose from pre-petition injuries and, as such, are not administrative expenses.

 This circuit has adopted the two-pronged test set forth in *In re Mammoth Mart, Inc.,* 536 F.2d 950 (1st Cir.1976), which determines whether a claim is entitled to administrative expense priority. *Id.* at 954. *See In re R.H. Macy & Co., Inc.,* 170 B.R. at 76. The test requires that: 1) the obligation arise from a transaction with the debtor-in-possession, and 2) result in direct benefit to the estate. *In re Mammoth Mart, Inc.,* 536 F.2d at 954. Examples of such expenses include, *inter alia,* rent, the costs of maintaining or repairing estate property, taxes incurred post-petition and expenditures incurred in operating, protecting and conserving the business post-petition. *See, e.g., In re American Anthracite & Bituminous Coal Corp.,* 171 F.Supp. 377, (S.D.N.Y.1959), *aff'd,* 280 F.2d 119 (2d Cir.1960) (rent); *In re W.T. Grant Co.,* 620 F.2d 319, 321 (2d Cir.1980) (severance pay).

 In this case, the State seeks reimbursement for monies paid post-petition to former employees of the Debtor for, among other things, hospital bills, injury exacerbations and death benefits related to and resulting from pre-petition injuries. The State argues that their claims arose not from the pre-petition injuries but rather post-petition, when the Debtor defaulted in paying the assessments arising from adjudication to award of liability after the Petition Date. I disagree with the State and find that the instant claims arose pre-petition, on the date of original injury. On that date, not only did the Debtor's obligation to the employee arise, but the State's contingent claim against the Debtor, namely, the obligation to pay benefits if the Debtor failed to do so, was also triggered.

A claim means a "right to payment, whether fixed, liquidated, unliquidated, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured". *In re Chateaugay,* 53 F.3d 478, 496 (2d Cir.1995) (*citing* 11 U.S.C. 101(5)(A)), *cert. denied, LTV Steel Co., Inc. v. Shalala,* —— U.S. ——, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995). Congress intended this definition to have wide scope. *Id.* (*citing In re Chateaugay,* 944 F.2d 997, 1003 (2d Cir.1991)). Claims for workers' compensation claims have been found to arise on the date of injury. *See In re Johns–Manville Corp.,* 57 B.R. 680, 690 (Bankr.S.D.N.Y.1986) (stating that the existence of a claim depends upon "when the acts giving rise to the alleged liability were performed ..."); *Collora v. Leahy (In re Leahy),* 170 B.R. 10, 16 (Bankr.D.Me.1994) (finding that "an employee's right to workers' compensation benefits ... arises at the time of the compensable injury"); *In re Lull Corp.,* 162 B.R. 234, 241 (Bankr.D.Minn.1993) (holding that an "employee's right to payment [of benefits], the Debtor's obligation to pay, and [the Fund's] obligation to pay when debtor does not all arise when the employee is injured pre-petition"); *In re U.S. Truck Company, Inc.,* 42 B.R. 790, 793 (Bankr. E.D.Mich., S.D.1984) (asserting that "the date of injury is critical to the administration of the workers' compensation system ... all benefits relate back to the date of injury, no matter when the periodic payment becomes due"); *Anderson v. State Workers' Comp. Comm'r,* 174 W.Va. 406, 327 S.E.2d 385, 387 (1985) (holding that "benefits ... are calculated on the basis of the original date of injury assigned when the claim is filed ... the claimant has no burden to prove additional exposure; only additional disability"). Based on the breadth of the Code's definition of "claim" and relevant case law, I find that the State's right to reimbursement from the Debtor arose on the date of injury, albeit unmatured or contingent on that date.

Since the instant claim for reimbursement arose pre-petition and not from a transaction with the Debtor-in-possession, it follows that the State's post-petition payment for such

pre-petition liabilities could not confer a benefit upon the debtor-in-possession in the continuing operation of business. As such, the claims are pre-petition claims and not entitled to administrative expense status. *See In re Lull Corp.,* 162 B.R. at 240–41 (stating that "workers' compensation claims for injury that occurred pre-petition but are paid post-petition are not administrative expenses"); *In re Chateaugay,* 177 B.R. 176, 181 (S.D.N.Y.1995) (holding that "workers' compensation payments paid on behalf of the debtor-in-possession to employees for pre-petition injuries should not be classified as an administrative expense") (*citing In re REA Express, Inc.* 442 F.Supp. 71, 74 (S.D.N.Y. 1977)), *aff'd, In re REA Express, Inc.,* 591 F.2d 1331 (2d Cir.1978); *In re Chateaugay,* 153 B.R. 632, 637 (Bankr.S.D.N.Y.1993) (holding that Michigan and Minnesota's claims "for reimbursement of payments made to their respective residents relating to workers' compensation claims are not entitled to administrative status").

**Tax Priority**

■ Having found no basis upon which to award administrative priority, it is necessary to determine whether any part of the State's claim is entitled to eighth priority in distribution as an excise tax. Eighth priority is granted to allowed unsecured claims of governmental units for excise taxes on transactions occurring during the three years immediately preceding the date of filing a petition. *See* 11 U.S.C. 507(a)(8)(E)(ii). As set forth below, I find that the instant obligation is an excise tax. However, because "transaction," for purposes of this section, is the date of injury, tax priority will extend only to those award payments related to injuries which occurred in the three years preceding the Petition Date.

**Excise Tax**

■ Whether a government exaction is an "excise tax" is a matter of federal law. *See City of New York v. Feiring,* 313 U.S. 283, 285, 61 S.Ct. 1028, 1029, 85 L.Ed. 1333 (1941). The Ninth Circuit Court of Appeals delineated four factors which this court, and others, have adopted in evaluating whether a government exaction is a tax. *See In re*

*Lorber Industries of California, Inc.,* ("*Lorber*"), 675 F.2d 1062, 1066 (9th Cir.1982); *In re Chateaugay,* 53 F.3d at 498; *In re Chateaugay,* 177 B.R. at 183; *New Neighborhoods,* 886 F.2d at 720. A tax is:

1) An involuntary pecuniary burden, regardless of name, laid upon individuals or property;
2) Imposed by, or under authority of the legislature;
3) for public purposes;
4) under the police or taxing power of the state.

*In re Lorber,* 675 F.2d at 1066.

I note, as an initial matter, that this district has recently determined that, in general, the payment of workers' compensation claims is an excise tax. For example, in *In re Chateaugay,* 177 B.R. at 184, the court denied tax priority status to a subrogee who secured LTV's payment of workers' compensation obligations in six states including West Virginia and who sought tax and administrative priority as a subrogee to the rights and priorities of the Bonded States. In its analysis, the court applied the *Lorber* factors holding that "workers' compensation obligations of Debtors must be considered 'taxes' entitled to priority status under 507(a)(7)(E). *See also, In re Chateaugay,* 1995 WL 656967 *1 (S.D.N.Y.1995) (reversing, in part, Judge Conrad's decision in *In re Chateaugay,* 153 B.R. 632 by adopting analysis and conclusion of court in *In re Chateaugay,* 177 B.R. at 184, and holding that Minnesota's reimbursement claim was entitled to tax priority status); *In re Chateaugay,* 154 B.R. 416, 421 (S.D.N.Y.1993) (finding that Coal Act obligations were taxes and noting that "mandatory contributions to a state insurance fund under a workman's compensation scheme were found to constitute taxes") (*citing In re Pan American Paper Mills, Inc.,* 618 F.2d 159, 162 (1st Cir.1980)), *aff'd, In re Chateaugay,* 53 F.3d 478 (2d Cir.1995), *cert. denied, LTV Steel Co. Inc. v. Shalala,* — U.S. —, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995).

■ The Debtor asserts, however, that the above mentioned case law either did not adequately distinguish among the types of workers' compensation obligations an em-

ployee may have; namely the debtor's instant obligation to repay benefits paid to workers by the State. Additionally, according to the Debtor, the cases did not address the expanded excise tax analysis set forth by the Sixth Circuit Court of Appeals' in *Ohio Bureau of Workers' Compensation v. Yoder (In re Suburban Motor Freight, Inc.) ("Suburban II ")*, 36 F.3d 484 (6th Cir.1994).

### Lorber Test

First, based upon a review of the case law and the West Virginia Statute, the State's reimbursement claim meets the *Lorber* test. Under the Statute, the instant obligation is an involuntary, pecuniary burden. Employers must participate in the system either as a Subscriber or a Self–Insured. The primary difference between a Subscriber and a Self–Insurer is that a Self–Insurer pays benefits directly to injured claimants in lieu of a Subscriber's advance payment of premium. These obligations are similarly compelled and non-compliance is similarly remedied. *See* W.Va.Code 23–2–5a. The Debtor asserts that section 23–2–5a's non-compliance remedies may not apply to defaulting Self–Insurers because the section is titled "[c]ollection of *premiums* from defaulting employers ..." (emphasis added). I find, however, that the language of section 23–2–5a expressly extends the civil action, lien and distraint remedies to "an employer who ... defaults in any payment required by this chapter" and thus applies to Self–Insurers as well as to Subscribers. *See also New Neighborhoods*, 886 F.2d at 717 (finding that, pursuant to section 23–2–5, "a civil action [may be commenced] against an employer who has failed to make any required payment"). As such, and based upon the entire statutory scheme, the instant reimbursement obligation, like the payment of a premium, is an "involuntary, pecuniary burden". *In re Chateaugay*, 177 B.R. at 183–84 (holding that LTV's obligations "must be considered 'involuntary pecuniary obligations ...' [because] [in West Virginia], [employers] are required to participate in the workers' compensation scheme and to pay benefits either through insurance or through contributions to the State's workers' compensation funds").

Moreover, the obligation is imposed by the Legislature under the police power of the State. *Id.* at 184 (stating that "the second and fourth prongs of the *Lorber* test are likewise satisfied since Debtors' workers' compensation obligations were 'imposed by ... the legislature ... [u]nder the police or taxing power of the state' ") (*quoting In re Lorber*, 675 F.2d at 1066); *See also New Neighborhoods*, 886 F.2d at 719 (finding that West Virginia law places upon employers the obligation "to provide and pay for workers' compensation coverage"). Finally, the public purpose behind all obligations imposed under the Statute "is to allocate the burden of the costs of injured employees and/or of their dependents among employers rather than among the general public". *New Neighborhoods*, 886 F.2d at 718–19, *accord In re Chateaugay*, 177 B.R. at 184.

### Suburban II criteria

Having found that the reimbursement obligation meets the *Lorber* factors, it is appropriate to review the expanded criteria set forth in *Suburban II*. According to the 6th Circuit, an important distinction exists between premium payments due from subscribers and reimbursement obligations arising in connection with a self-insurers failure to pay claims. The distinction, according to the Suburban Court, is that premiums are assessed against a large group of employers for the benefit of the general public, while claims for reimbursement benefit the state by allowing the state to recover costs expended on behalf of a specific entity in a discrete situation. In light of this distinction the Court determined that the *Lorber* test, particularly the public purpose prong, needed refinement. The Court found the *Lorber* test "insufficient [in that it does not] limit in any meaningful way the circumstances under which government claims would be entitled to priority." *Suburban II*, 36 F.3d at 488. As stated by the Court:

> All money collected by the Government goes toward defraying its expenses, and is used for public purposes. The threat of the Lorber reasoning, then, is that the Government automatically wins priority for all money any debtor owes it, regardless of the nature of the payments.

*Id.* (*citing In re Suburban Motor Freight, Inc.* ("*Suburban I*"), 998 F.2d 338, 341 (6th Cir.1993)). As such the Court required additional criteria, namely that 1) the obligation be universally applicable to similarly situated entities, and 2) granting priority treatment to the government claim not disadvantage private creditors with like claims. *See Suburban II,* 36 F.3d at 488. While I agree with the 6th Circuit's rationale for the additional criteria, especially in light of the Code's goal of equality in distribution and the need to narrowly construe priorities, I do not find the expanded analysis fatal to a determination that the instant obligation is an excise tax.

First, granting priority treatment to the State's reimbursement claim does not disadvantage private creditors with like claims. This criteria was required, according to the *Suburban II* Court, because, where a state scheme allows a private insurance option such as bonded self-insurance, "its claim that the public welfare depends on the financial soundness of its own funding system for making the very same payments is diluted." *Id.* at 489. In this vein and in relation to the State's Self–Insurance Claim, the Debtor points to the fact that Aetna and INA (the "Sureties") as well as the State have satisfied the Debtor's self-insurance obligations and that the Sureties received non-priority treatment for their claims. Allowing priority status to the State alone would, according to the Debtor, be unfair and would "leave unpaid private insurers to languish along with other unsecured creditors." (Reply Memo in Further Support at 14–15) (*citing Suburban II,* 36 F.3d at 489).

I do not find the Debtor's argument compelling here. First, the Sureties' claims are not like the State's claims. The Sureties' claims arose from contractual agreements entered into with the Debtor voluntarily. Presumably, the Sureties charged a fee to reflect the risk undertaken. *See also, In re Chateaugay,* 177 B.R. at 181 (holding that there was "nothing inequitable in denying administrative priority to a surety which was compensated by the premium it charged for the risk of the debtor's default.").

Nor does the Code treat government and surety claims alike. The Code has determined that government claims for taxes are entitled to priority in distribution. *See* 11 U.S.C. 507(a)(8)(E). No such distinction has been granted to the claims of sureties. Additionally, section 507(d) of the Code extends to 507(a)(8) and bars priority status with respect to subrogated claims which would otherwise receive priority. *See In re Chateaugay,* 177 B.R. at 185 (finding that "courts have consistently denied priority status to subrogees making claims under 507(a)(7) ... claims of subrogees who paid taxes are not entitled to the same status ... surety, in its capacity as subrogee to states' right to payment, did not also succeed to states' excise tax priority").

Finally, case law has distinguished surety and government claims. *See New Neighborhoods,* 886 F.2d at 720 (distinguishing government claims for premiums from private insurer claims by stating that "[n]or does the fact that, under the holding we state in this case, a state agency is given, as an insurer, priority in bankruptcy when a private insurer is not tip the scales against construing the workers' compensation premiums as 'excise taxes'; such a difference is really only a 'distinction between the sovereign power of the state and the rights of private citizenry' ") (*citing State Indus. Accident Comm. v. Aebi,* 177 Or. 361, 162 P.2d 513, 517 (1945)).

Based on all of the above, I do not find that the Sureties have claims like the States' such that granting priority status to the State alone would be unfair.

Second, the instant obligation is universally applicable to similarly situated entities. The Court in *Suburban II* asserts that this requirement is meant to ensure that the exaction's burden and benefit inure to the general public welfare and not provide a discrete benefit to or result from privileges claimed by the payor. *See Suburban II,* 36 F.3d at 489. The Debtor asserts that its liability arising from pre–1976 Subscriber Period injuries is not a liability universally applicable to similarly situated entities but rather "arises merely because Olga opted to be a Self–Insurer ... and subsequently defaulted in the payment of pre-July 1976 awards ... Olga's liability arises solely by virtue of its default". (Reply Memo in Further Support

at 16). As such, the Debtor argues that the benefit resulting from the Debtor's liability for these claims payments is not one inuring to the general public. This argument cannot find sustenance. The liability for awards arising from Subscriber Period injuries is a liability universally imposed on all employers obtaining the privilege of self-insurance. Rule 4.02(b) of the Rules and Regulations requires an employee who becomes a self-insurer to pay all awards made after the effective date of self-insurance even if the claim arose prior to that date. This obligation is one that is universally applied. *See New Neighborhoods* 886 F.2d at 719 n. 4 (stating that "an exaction is not deprived of its capability of being a tax because it is not generally applied beyond the confines of a given class").

Based upon all of the above, I find that the Debtor's obligation to reimburse the State meets both the *Lorber* and the *Suburban II* criteria and is therefore an excise tax.[5]

**Transaction Occurring Within 3 Years**

▮▮▮ The final issue is the extent to which, if any, the priority will attach. Section 507(a)(8)(E)(ii) extends priority only to those excise taxes on transactions occurring within three years prior to filing for bankruptcy. The Parties disagree as to what is the relevant "transaction". The State argues that "transaction" refers to the post-petition dates on which awards were assessed against the Debtor. The Debtor, on the other hand, asserts that "transaction" relates to the pre-petition dates of injury. As stated previously in my analysis of administrative expense priorities, it was determined that worker's compensations claims arise on the date of original injury. As such, I find that "transaction", for purposes of section 507(a)(8)(E), is the date of injury. Consequently, that portion of the State's claim seeking reimbursement for benefits which arose from injuries which occurred in the three years pre-

ceding the Petition Date are entitled to tax priority status. The remainder of the State's claim is entitled to general, nonpriority, unsecured status.

Submit an order consistent with the foregoing.

---

5. In further support of its position, the Debtor points to *In re Chateaugay*, 153 B.R. at 640 (*quoting In re Payne*, 27 B.R. 809, 817 (Bankr. D.Kan.1983)), which held, in part, that Minnesota's reimbursement claim had " 'more substantial non-tax characteristics and [is] more likened to an assignment of or subrogation to a tort claim than a tax' ", despite the fact that the obligation to reimburse the fund was mandatory and served

a public purpose. I note, however that this point was reversed by the District Court after the final submission of papers in this case. *See In re Chateaugay*, 1995 WL 656967 (S.D.N.Y.1995). The reversal adopted the reasoning set forth in *In re Chateaugay*, 177 B.R. at 184, holding that "under case law, workers' compensation obligations of Debtors must be considered 'taxes' entitled to priority status."